LA FITTE COMPANY, Appellant,

v.

UNITED FUEL GAS COMPANY, Appellee.

No. 14125.

United States Court of Appeals Sixth Circuit.

Dec. 14, 1960.

William G. Hume, Louisville, Ky. (Eli H. Brown, III, Marshall P. Eldred, Brown & Eldred, Louisville, Ky.; and J. Woodford Howard and Howard & Francis, Prestonsburg, Ky., on the brief), for appellant.

C. E. Goodwin, Charleston, W. Va. (C. E. Goodwin, Herbert W. Bryan, H. L. Snyder, Jr., Charleston, W. Va., on the brief), for appellee.

Before MARTIN, CECIL and O'SULLIVAN, Circuit Judges.

MARTIN, Circuit Judge.

This is an appeal from a judgment dismissing the complaint of The LaFitte Company in an action brought against the appellee. The plaintiff sought an accounting, a declaration of rights, and consequential damages of $767,648.50, arising out of alleged violations by the United Fuel Gas Company of its covenants and obligations as lessee, holding and operating certain oil and gas properties in the State of Kentucky. Appellant was lessor of the properties in Floyd and Knott Counties.

In the District Court, appellant complained of failure on the part of appellee (1) to remit to LaFitte Company sufficient royalty payments as required by the terms of the lease; (2) to develop adequately the leased premises, which had resulted in the drainage of gas from beneath the leased property by wells located on adjoining properties; and (3) failure to remit to the LaFitte Company its royalty interest from the proceeds derived by lessee from the sale of by-products extracted from the gas taken from the leased premises. The LaFitte Company has appealed from only that portion of the judgment which denied it any relief under the first of the three above contentions.

The case was tried in the United States District Court without a jury. The District Judge stated that he did not consider the lease ambiguous; and evidence purporting to explain the terms of the lease, because of conceived ambiguity, was considered incompetent. In relation to the first claim of the plaintiff, the

District Court found that since the "lease does not specify either the place of market or the price to be paid, the lease must be considered an open end lease and the market value of the gas to be determined at the wellhead. Rains v. Kentucky Oil Co. et al., 200 Ky. 480, 255 S.W. 121. The case of Warfield Natural Gas Co. v. Allen, 261 Ky. 840, 88 S.W.2d 989, seems to be conclusive on this question and therefore binding upon the court in its determination."

A brief history of the present controversy seems necessary. On October 3, 1924, Elk Horn Coal Corporation executed a lease to the Ohio Fuel Oil Company for a working interest in 14,983 acres of land, identified as being in the "Checkerboard" area which contained 42,880 acres. The appellant is a successor in title to the original lessor and the appellee is successor to the original lessee.

On April 20, 1932, Elk Horn Coal Corporation conveyed its interest to Louisville Gas Royalties, Inc., which, in turn, conveyed its interest to Producers Pipe Line Company on August 2, 1932. On June 21, 1945, Producers Pipe Line Company conveyed its interest to First National Bank and Trust Company of Lexington, Kentucky; and the First National Bank conveyed its interest to the LaFitte Company on March 1, 1946. There was also a deed from Producers Pipe Line Company to LaFitte, dated February 23, 1955.

The original lessee (Ohio Fuel Company) conveyed its interest to the War-field Natural Gas Company on November 1, 1928; and Warfield conveyed its interest, as lessee, to the United Fuel Gas Company on December 26, 1946. Thus, the interests as lessor, and lessee, respectively, devolved to appellant, The LaFitte Company, on the one hand, and to appellee, United Fuel Gas Company, on the other.

The original lessee went upon the land and developed it according to the terms of the lease. For more than twenty-five years, there was continued development and production without controversy or disagreement between the original parties and their successors and assigns. Indeed, no controversy arose until 1951, when the appellee wrote a letter to the appellant stating that, while the wholesale market price for gas had been twelve cents per MCF for the past years, they proposed to increase the price to fifteen cents, effective January 1, 1951. The letter also made a request for certain changes in the lease with reference to meter readings and asked the appellant for approval of such changes. No consent was given; but the letter of January, 1951, evidently prompted the officials of the appellant company to examine the original lease. This action resulted in a controversy concerning the terms of the lease which could not be settled satisfactorily between the parties.

The controverted portion of the lease is found in Paragraph two.[1]

1. In consideration of the premises, the Lessee covenants and agrees: (1) To deliver to the credit of the Lessor. * * * (2) Also one-eighth (⅛) of the gross income received by the Lessee from the sale or disposition in whatever manner and for each and every purpose, of gas produced and sold or marketed in its natural or reduced state from the demised premises.

Also one-eighth (⅛) part of the proceeds received from the manufactured by-products of natural gas if said natural gas be manufactured into by-products by the Lessee or. its assigns less the Lessor's proportionate part of the transportation charges. Said transportation charges to be the delivery cost of said by-products from the point of manufacture to the place of sale or market, it being the intention and purpose that the Lessor is to receive the one-eighth (⅛) part of all monies received by the Lessee from the sale of the gas from the demised premises whether sold in its natural state or sold after the extraction of the by-products of the natural gas and also one-eighth (⅛) of the proceeds of said by-products as above set out. The Lessee agrees that it will sell the gas produced by it from the leased premises hereunder and the by-products thereof, herein mentioned for not less than the fair wholesale market value of the same in the vi-

The District Court reached two basic conclusions: (1) that the lease is not ambiguous, for which reason no evidence was considered purporting to explain any conceived ambiguity; and (2) the lease does not specify either the place of market or the price to be paid.

■■ It would seem that the District Court's finding that the lease is not ambiguous was well founded in fact and, certainly, it was not clearly erroneous. While it is true that parol evidence is inadmissible to contradict or vary the terms of a valid written instrument which is not ambiguous, it is also true that in certain circumstances evidence may be received to explain the meaning of the terms of the agreement. The United States District Judge applied this rule.

The record reveals evidence covering a period of over twenty-five years during which the conduct of the parties was in complete harmony; and no dispute arose indicating any ambiguity in the lease. During this period, the lease was transferred three times and no thought of ambiguity was indicated at any time. The conduct of the parties to the lease over this entire period provided the District Court a firm evidentiary foundation upon which to rest its finding that the lease was not ambiguous.

■ The trial court considered the case of Warfield Natural Gas Company v. Allen, 261 Ky. 840, 88 S.W.2d 989, as controlling on the question of how and where the value of the gas is to be determined. On this point, Rains v. Kentucky, 200 Ky. 480, 255 S.W. 121, and

Reed v. Hackworth, Ky., 287 S.W.2d 912, were also cited by the court as conclusive upon the issue of the basis of computation of royalties where the lease is silent on the subject. The court's reliance upon these cases, and the reasoning contained therein, makes it necessary to consider carefully whether the lease involved here is actually silent on market place and price. If it is not, the cases are not applicable and the opinion of the District Court on the royalty question would be unsound.

The lease provides: "Lessee agrees that it will sell the gas produced by it from the leased premises hereunder and the by-products thereof, herein mentioned *for not less than the fair wholesale market value of the same in the vicinity thereof* at the time of making any contract for the sale of same, or any part thereof, and that any contract for the sale of same shall contain such provisions as will reasonably insure to the Lessor the fair *wholesale market value* of its part of same throughout the term of said contract. [Italics supplied.]" The product was required to be "marketed upon such terms as will enable the Lessor to obtain at all times *the fair value* of the same in the open market * * * either the contract price therefor, *or the fair, wholesale market price thereof in the vicinity where the same is produced or sold."* [Italics supplied.]

In Warfield Natural Gas Company v. Allen, supra, the lease provided [261 Ky. 840, 88 S.W.2d 990]: "The lessee to pay for each gas well from the time and while the gas is marketed the sum of one-eighth of proceeds received thereof, pay-

cinity thereof at the time of making any contract for the sale of the same, or any part thereof, and that any contract for the sale of same shall contain such provisions as will reasonably insure to the Lessor the fair wholesale market value of its part of same throughout the term of said contract. Every contract for the sale of gas from the leased premises, as well as the by-products thereof, shall be fairly made, it being the agreement and intention of the parties hereto that the said gas and by-products thereof shall be marketed upon such terms as will enable

the Lessor to obtain at all times the fair value of the same in the open market. If, however, lessee sells the natural gas or any product thereof mentioned in the foregoing paragraph, either to itself or to any subsidiary corporation owned or controlled by it, the price of such gas or product for which the lessee shall be accountable to the lessor shall be at the lessor's option—either the contract price therefor, or the fair, wholesale market price thereof in the vicinity where same is produced or sold.

able each three months. Lessee agrees to bury, when requested so to do by the lessor all pipe lines used to conduct gas off the premises." There is no mention of "market place" in the passage involved; and the nearest statement to the mention of "price" is "one-eighth of proceeds received thereof."

In the lease controverted here, the terms "fair wholesale market value" and "fair wholesale market price" are used. In relation to market place, the expression "in the vicinity where the same is produced or sold" is used. The District Court found applicable here the cases of Warfield Natural Gas Company v. Allen, supra, and Reed v. Hackworth, supra; and, in our opinion, this finding is justified. The mere mention of "fair wholesale price" is not, in our judgment, as strong a statement of price as is the expression "one-eighth of the proceeds." Nor do the statements in the lease which refer to "in the vicinity thereof" and "in the vicinity where the same is produced or sold" appear to be clear enough to justify a conclusion that the District Court's finding is clearly erroneous.

Concerning the silence of the lease with respect to market place and price, the District Court placed primary reliance on the authority of the Warfield case. On first impression, that case would seem to have been decided entirely on the question of accord and satisfaction. But it goes much farther and is applicable to the present case. While there was accord and satisfaction in Warfield v. Allen, the court did not limit its opinion to that point. It went farther and discussed the silence of the lease on the matters of market place and price, stating that the lease there involved was silent as to those matters; and that, in such circumstances, the market place is usually found to be the place of production.

In the Warfield case, as in the present controversy, the court considered important the fact that the gas was measured at the well. This, therefore, is deemed to be the market place as well as the place of production. In Warfield, as here, the defendant sold the gas at places other than at the well; but it was required to pay to the plaintiff only one-eighth of the gross proceeds from sales made at the well, even though later sales at other places were made at higher prices. The Warfield case, then goes much farther than accord and satisfaction.

Appellant has relied heavily upon the authority of Columbian Fuel Corporation et al. v. United Fuel Gas Company, D.C., 72 F.Supp. 843, affirmed 4 Cir., 165 F.2d 746, 751, to support the proposition that the trial court in the instant case should have considered contracts for the sale of gas made in the surrounding territory. However, the factual situation in the Columbian Fuel case makes its applicability to the present case doubtful, or at least reduces its weight as authority.

In the Columbian Fuel case, the controversy concerned an arbitration award. The parties to the contract involved had provided that, in the event they could not reach agreement as to the price to be paid for gas, they would submit the issue to arbitration. A submission to arbitration was made; but the defendant gave notice that it would refuse the award and endeavor to have it set aside. During the arbitration proceedings, the question of consideration by the arbitrators of certain evidence was raised, even though the arbitrators were not bound by the rules of evidence. In reaching decision as to what, under the contract, would be "the reasonable market value of gas in the territory," the arbitrators considered evidence of value in adjoining counties, not limiting themselves to the territory involved. This, the appellant would have the court do in the instant case. We think that, in the Columbian Fuel case, the use by the arbitrators of such evidence was not considered to be

of controlling importance. The arbitrators were not bound as is a District Court, by the rules of evidence.

The Fourth Circuit opinion writer in the *Columbian Fuel* case stated: "We cannot say that the arbitrators misinterpreted the contract or that they considered improper evidence in making their award; *but, had they done so, this would not vitiate the award.*" That court, citing Burchell v. Marsh, 17 How. 344, 15 L.Ed. 96, commented: " * * * if the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A *contrary course would be the substitution of the judgment of the Chancellor in place of judges chosen by the parties, and would make an award the commencement, not the end of litigation.*" The Court of Appeals reasoned that, even if the award of the arbitrators were based on the consideration of improper evidence, the court should not set it aside. This holding would afford Columbian Fuel Corporation little, if any, applicability to a case where the question involved was whether or not a District Court was *correct in considering certain evidence incompetent.*

Inasmuch as the United States District Court's opinion rejecting the claim for additional amounts due under the royalty clause of the contract should be affirmed for the reasons heretofore stated, it is not necessary to the determination of the issue presented by this appeal to consider the unchallenged portion of the judgment. Therefore, the District Court's opinion dealing with the other defenses advanced by the appellee upon the trial need not be discussed.

The judgment of the District Court is affirmed.