RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

No. 09-5914

POPLAR CREEK DEVELOPMENT COMPANY, on behalf of itself and all others similarly situated,

        *Plaintiff-Appellant,*

*v.*

CHESAPEAKE APPALACHIA, L.L.C.,

        *Defendant-Appellee.*

No. 10-5373

JOHN THACKER, individually and on behalf of all others similarly situated; JACKSON ROWE, INC., individually and on behalf of all others similarly situated,

        *Plaintiffs-Appellees,*

POPLAR CREEK DEVELOPMENT COMPANY; ALMA LAND COMPANY; APPALACHIAN LAND COMPANY,

        *Claimants-Appellants,*

*v.*

CHESAPEAKE APPALACHIA, L.L.C.; NISOURCE, INC.; COLUMBIA ENERGY GROUP,

        *Defendants-Appellees.*

Nos. 09-5914; 10-5373

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
Nos. 08-00190; 07-00026—Gregory F. Van Tatenhove,
Karen K. Caldwell, District Judges.

Argued: December 9, 2010

Decided and Filed: February 17, 2011

Before:  GILMAN and GRIFFIN, Circuit Judges; COLLIER, Chief District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  George E. Stigger, St. Marys, Georgia, Gary E. Mason, MASON LLP, Washington, D.C., for Appellants.  Barbara B. Edelman, DINSMORE & SHOHL LLP, Lexington, Kentucky, Anne A. Chesnut, GREENEBAUM DOLL & McDONALD PLLC, Lexington, Kentucky, Clark C. Johnson, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellees.  **ON BRIEF:**  George E. Stigger, St. Marys, Georgia, Gary E. Mason, Donna F. Solen, MASON LLP, Washington, D.C., John C. Whitfield, WHITFIELD & COX, P.S.C., Madisonville, Kentucky, for Appellants. Barbara B. Edelman, Whitney Howard Mendiondo, DINSMORE & SHOHL LLP, Lexington, Kentucky, Anne A. Chesnut, Joseph A. Tarantelli, GREENEBAUM DOLL & McDONALD PLLC, Lexington, Kentucky, Clark C. Johnson, Marjorie A. Farris, STITES & HARBISON, PLLC, Louisville, Kentucky, John Famularo, Thomas E. Meng, Daniel E. Danford, STITES & HARBISON, Lexington, Kentucky, for Appellees.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.  These cases arise out of a dispute over the respective rights of lessors and lessees under Kentucky oil and gas leases.  Both actions are resolved by determining whether Kentucky law allows lessees, in calculating gas royalty payments, to take into account certain post-production costs as an offset against the value or proceeds upon which royalty payments are based.  Because the two appeals involve the same or similar leases, have some parties in common, and raise similar legal questions, we have consolidated these two cases for decision.

In case number 09-5914 (the "*Poplar Creek* action"), plaintiff Poplar Creek Development Company ("Poplar Creek") brought a proposed class action for breach of contract, breach of the implied covenant to market gas, and for declaratory judgment, claiming that defendant Chesapeake Appalachia, L.L.C. ("Chesapeake") is liable to all

_____

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

lessors in Kentucky from whom it leases gas rights because of improperly deducted costs incurred in bringing natural gas to a marketable condition. In response, Chesapeake moved for judgment on the pleadings, which the district court granted.

Following our thorough review, we affirm. In doing so, we hold that Kentucky follows the "at-the-well" rule, which allows for the deduction of post-production costs before paying appropriate royalties.

In case number 10-5373 (the "*Thacker* action"), named plaintiffs John Thacker and Jackson Rowe, Inc. filed the instant class action on February 6, 2007, against defendants Chesapeake, NiSource, Inc. ("NiSource"), and Columbia Energy Group ("Energy Group") (collectively "defendants"), on behalf of a class consisting of Kentucky landowners who are lessors under natural gas leases with the defendants. This diversity class action was resolved by a settlement approved by the district court on March 3, 2010. Claimants Poplar Creek, Alma Land Company, and Appalachian Land Company (collectively the "Poplar Creek Objectors"), objectors to the settlement, appeal the March 3 order on grounds similar to those raised in the *Poplar Creek* action.

At oral argument, the Poplar Creek Objectors conceded that their challenge to the approved settlement fails should this court affirm the district court in the *Poplar Creek* action. Having concluded that the judgment in the former case must be affirmed, we affirm the settlement order in the companion case.

I.

We begin by reviewing the factual and procedural history in the *Poplar Creek* action.

A.

Poplar Creek is the current lessor and fee simple owner of gas interests located in Pike County, Kentucky, as set forth in the November 23, 1951, oil and gas lease originally entered into between Majestic Collieries Company (predecessor in title to Poplar Creek) and Hurricane Mineral Corporation (as lessors), and United Fuel Gas

Company.   Chesapeake is the successor-in-interest to the lessee, United Fuel Gas Company.   Chesapeake has produced gas from wells it owns and operates on the leasehold, and it has paid and continues to pay royalties to Poplar Creek on that gas.

The parties' lease contains the following provision concerning the payment of gas royalties:

> IN CONSIDERATION OF THE PREMISES, the said Lessee covenants and agrees,
>
> * * *
>
> 2nd.  To pay to the Lessor a royalty for the gas produced and marketed from any gas well on the leased premises at the rate of one-eighth (1/8) part of the wholesale market value of such gas at the well based on the usual price paid therefor in the general locality of said leased premises . . . .

Chesapeake sells the gas at a market away from the well, which results in increased expenses, including gathering,[1] compression,[2] and treatment[3] costs.  *See Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 891 (Mich. Ct. App. 1997) (noting that "natural gas is not typically sold at the wellhead").  Poplar Creek refers to these costs as "production costs," but they are more appropriately labeled post-production costs because these expenses are incurred after the gas leaves the wellhead.  As Chesapeake notes, "[p]roduction costs, like those incurred drilling, operating and

---

[1]"Gathering" involves gathering small amounts of gas from individual wells, then aggregating the gas into larger lines until it is in a transmission pipeline.  As set forth in 30 C.F.R. § 1206.151 (2010), "[g]athering means the movement of lease production to a central accumulation and/or treatment point on the lease, unit or communitized area, or to a central accumulation or treatment point off the lease, unit or communitized area . . . ."

[2]"Compression," as defined in 30 C.F.R. § 1206.151 (2010), is "the process of raising the pressure of gas."  It is often used to transport low pressure gas through the pipeline to a place where it can be sold.  In *Merritt v. Southwestern Electric Power Co.*, 499 So.2d 210 (La. Ct. App. 1986), the Louisiana Court of Appeals noted that:  "In order to market the gas, it first had to be compressed.  Thus, the gas was useless and had no market value at the wellhead until it could be moved into the gathering line by compression."  *Id*. at 213.

[3]Gas is treated before it is sold to remove impurities or otherwise enhance its value.  *See* Randy Sutton, Annotation, *Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs*, 99 A.L.R. 5th 415 (2008) (describing "treatment costs" as arising from "the need, in some cases . . . to treat the gas to remove harmful substances or to enhance its value").

maintaining a well, as well as other costs incurred in order to extract gas from the earth and bring it up to the wellhead, are borne entirely by Chesapeake, according to the Lease." Additionally, Kentucky imposes a 4.5% tax for the privilege of severing and/or processing natural resources. *See* Ky. Rev. Stat. § 143A.020.

Chesapeake deducts these post-production costs from the price at which it sells the gas away from the well in order to calculate the market value of the gas "at the well." Poplar Creek alleges that these deductions are improper, and that the terms of the lease and Kentucky law require Chesapeake to bear all such costs itself. The district court agreed with Chesapeake and ruled that "Kentucky courts would interpret the lease provision in this case, requiring Chesapeake to pay royalties based on the gas's value 'at the well,' to unambiguously mean just that – that Chesapeake must pay royalties on the value of the gas at the well, before it has been gathered, treated, or compressed."

Poplar Creek now timely appeals.

B.

In the *Thacker* action, John Thacker and Jackson Rowe, Inc. asserted breach-of-contract and fraud claims on behalf of a class consisting of Kentucky landowners who are lessors under natural gas leases with the defendants. Similar to the *Poplar Creek* action, the *Thacker* complaint alleged that it was a breach of contract for the lessees to deduct certain post-production expenses from the calculation of the royalty payments.

The class was certified and a proposed settlement preliminarily approved in August 2009. Under the terms of the settlement agreement and plan of allocation, defendants agreed to contribute $28,750,000 to a settlement fund. Notice was sent to the 8,185 eligible class members, and 68 class members opted out of the settlement. Twelve class members, including the Poplar Creek Objectors, filed objections. Relevant here, the Poplar Creek Objectors argued that the settlement was unfair because it permitted the defendants to continue to deduct post-production expenses from royalty payments. In response, the district court noted that an action by Poplar Creek, i.e. the *Poplar Creek*

action, raising this claim had been dismissed by the court based on a finding that the manner in which royalties were calculated under the leases was consistent with Kentucky law. The court subsequently overruled this objection, and others raised by the Poplar Creek Objectors, and approved the settlement.

The Poplar Creek Objectors now timely appeal.

## II.

Because the *Thacker* action appeal is explicitly premised upon Poplar Creek prevailing in its appeal in the *Poplar Creek* action, we shall consider the merits of the appeal in case number 09-5914 first.

## A.

We review a district court's grant of judgment on the pleadings under Rule 12(c) using the same de novo standard of review applicable to orders of dismissal under Rule 12(b)(6). *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (citation and internal quotation marks omitted).

The parties do not dispute that Kentucky law is the applicable law governing this dispute. A federal court sitting in diversity must apply the law of the highest state court if that court has ruled on the matter in dispute; otherwise, the court may rely on case law from lower state courts. *See Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001); *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000) (citing *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999)). Because Kentucky law determines that the construction of a contract is a legal question, the terms of the contract are reviewed de novo. *See Morganfield Nat'l Bank v. Damien Elder & Sons,* 836

S.W.2d 893, 895 (Ky. 1992); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

B.

The dispositive issue in this case is the meaning of "wholesale market value of such gas at the well" in the parties' royalty clause and the propriety, under Kentucky law, of deducting post-production costs from the lessor's royalties. A number of courts in gas-producing states across the country have considered the meaning of similar royalty clauses in deciding which marketing or post-production costs, if any, are to be borne by the royalty owner. The decisions of these courts, however, have not been uniform. There are two diverse viewpoints, with some decisions picking and choosing between the two, depending on the specific cost under consideration. At one end of the spectrum is the view that, because the operator has an implied duty or an implied covenant to market the gas, all post-production costs must be borne by the operator. *See, e.g.*, *Garman v. Conoco, Inc.*, 886 P.2d 652, 653-54 (Colo. 1994) (holding that where a lease is silent with regard to how costs incurred post-production are to be borne, a lessee may not deduct costs required to make the mineral marketable). Poplar Creek advocates for this view, which the parties term the "marketable-product" rule.

At the other end of the spectrum, several courts have held that while there is an implied duty or covenant to market the gas, this duty does not extend to expenses incurred in sales not at the wellhead; post-production costs are to be shared proportionately by the working interest and royalty owners. *See, e.g.*, *Schroeder*, 565 N.W.2d at 894 ("gross proceeds at the wellhead" contemplates the deduction of post-production costs from the sale price of the gas, based on the view that "at the wellhead" refers to location for royalty valuation purposes). Chesapeake advocates for this view, which the parties term the "at-the-well" rule.

Of course, the parties' discussion of these two approaches helps only to frame the debate. Our task is not to determine which approach is best, but rather to decide the approach that the Kentucky Supreme Court would adopt if the issue were before it. *See*

*Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752, 755 (6th Cir. 2007) ("In resolving an issue of state law in a diversity case, this court must make the best prediction, even in the absence of direct state-court precedent, of what the Kentucky Supreme Court would do if it were confronted with the same question of law.") (citations and internal quotation marks omitted).

In *Lafitte Company v. United Fuel Gas Co.*, 284 F.2d 845 (6th Cir. 1960), we examined a Kentucky oil and gas lease similar to the one in this case.[4] Like the lease here, the lease in *Lafitte* provided for payment by the lessee of "*one-eighth* (1/8) of the gross income received by the Lessee from the sale or disposition in whatever manner and for each and every purpose, of gas *produced* and sold or *marketed* in its natural or reduced state from the demised premises." *Lafitte Co. v. United Fuel Gas Co.*, 177 F. Supp. 52, 56 (E.D. Ky. 1959) (emphasis added). The lease provided further that the "Lessee agrees that it will sell the gas produced . . . for not less than the fair wholesale market value of the same in the vicinity thereof at the time of making any contract for the sale of the same . . . ." *Id.*

There, as here, "appellant complained of failure on the part of appellee . . . to remit to [appellant] sufficient royalty payments as required by the terms of the lease[.]" *Lafitte Co.,* 284 F.2d at 846. As the trial court stated:

> The thrust of [the] case lies in the determination of whether the lease binds the lessee to pay one eighth of whatever gross income the lessee may ultimately receive from its buyer, at whatever place, either on or many miles from the leasehold, or whether . . . the clause in the lease is simply an open-end gas royalty clause, with the value of royalty . . . to be determined at the wellhead.

*Lafitte Co.*, 177 F. Supp. at 59.

---

[4]The parties, this court, and the district court all use different spellings of the appellant's name in *Lafitte Company v. United Fuel Gas Company*. Based on our review of the original docket, we believe the correct spelling is "Lafitte," and therefore refer to this party as such throughout this opinion.

In resolving this dispute, the trial court initially "reached two basic conclusions: (1) that the lease [was] not ambiguous . . . and (2) the lease [did] not specify either the place of market or the price to be paid." *Lafitte Co.*, 284 F.2d at 848. We agreed and held that the trial court's "finding that the lease [was] not ambiguous was well founded in fact and, certainly, it was not clearly erroneous." *Id.*

Next, "[t]he trial court considered the case of *Warfield Natural Gas Company v. Allen*, [88 S.W.2d 989 (Ky. 1935)], as controlling on the question of how and where the value of the gas is to be determined." *Lafitte Co.*, 284 F.2d at 848. "On this point, *Rains v. Kentucky*, [255 S.W. 121 (Ky. 1923)] and *Reed v. Hackworth, Ky.*, 287 S.W.2d 912 [(Ky. 1956)], were also cited by the court as conclusive upon the issue of the basis of computation of royalties where the lease is silent on the subject." *Lafitte Co*., 284 F.2d at 848. Specifically, the trial court opined:

> Since the lease does not specify either the place of market or the price to be paid, the lease must be considered an open-end lease and the market value of the gas to be determined at the wellhead. *Rains v. Kentucky Oil Company*, 200 Ky. 480, 255 S.W. 121. The case of *Warfield Natural Gas Co. v. Allen*, 261 Ky. 840, 88 S.W.2d 989, seems to be conclusive on this question and therefore binding upon the court in its determination. There it was held that a gas lease which provided for a royalty of one-eighth of the proceeds received from the property, but which did not contain a provision as to where the lessee was to find a market, was construed to fix the market value of the gas at the place of production although the gas was sold elsewhere at another market and for a higher price.
>
> In *Reed v. Hackworth, Ky*., 287 S.W.2d 912, the court cites the *Rains* and *Warfield* cases in support of its holding that if a lease is silent on the question, royalties should be based upon the market value of the gas at the well.

*Lafitte Co.*, 177 F. Supp. at 60-61.

This court affirmed, noting that the district court's application of *Warfield* and *Reed* were "justified." *Lafitte Co.*, 284 F.2d at 849. The *Lafitte* court further stated:

> While there was accord and satisfaction in *Warfield v. Allen*, the court did not limit its opinion to that point. . . .  It went farther [regarding] the matters of market place and price, stating that the lease there involved was silent as to those matters; and that, in such circumstances, the market place is usually found to be the place of production.
>
> * * *
>
> In *Warfield*, as here, the defendant sold the gas at places other than at the well; but it was required to pay to the plaintiff only one-eighth of the gross proceeds from sales made at the well, even though later sales at other places were made at higher prices.  The *Warfield* case, then goes much farther than accord and satisfaction.

*Lafitte Co.*, 284 F.2d at 849.

*Lafitte* is instructive.  "[I]n effect," it interprets the relevant Kentucky cases to "state that a presumption exists that the wellhead is the point of sale and delivery at which point the royalty is to be computed, absent an express stipulation to the contrary." *Ashland Oil & Ref. Co. v. Staats, Inc.*, 271 F. Supp. 571, 577  (D. Kan. 1967) (discussing *Lafitte*).  Here, far from having "an express stipulation to the contrary[,]" *id.*, the parties expressly stated in their lease that Chesapeake is to pay royalties based on the "wholesale market value" of the gas "at the well."  *See Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 240 (5th Cir. 1984) (applying Mississippi law) (recognizing that "the specification in the leases that royalty is computed 'at the well' controls[,]" and "'[a]t the well' means that the gas has not been increased in value by processing or transportation[,]" thus, "[t]he lessors under these leases are therefore entitled to royalty based on the value or price of unprocessed, untransported gas.") (citations omitted).  "Absent allegations of mistake or fraud, Kentucky law directs this court to construe the wording of the contract in accordance with its plain meaning."[5]

---

[5] In its appellate brief, Poplar Creek argues that another provision of the lease providing that the lessee must pay all taxes on gas produced under the lease, except with respect to the one-eighth royalty paid to the lessor, precludes a finding that the parties should also be required to proportionately share post-production costs.  Because Poplar Creek failed to raise this argument with the district court, we hold that Poplar Creek forfeited its right to present this theory on appeal. *See Estate of Quirk v. Comm'r of Internal Revenue*, 928 F.2d 751, 757-58 (6th Cir. 1991) (In the Sixth Circuit, "[i]t is well-settled that, absent exceptional circumstances, a court of appeals will not consider an argument by an appellant that was not presented to or considered by the trial court.").

*O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 455 (6th Cir. 2005) (unpublished); *see also Oliver v. Louisville Gas & Elec. Co.*, 732 S.W.2d 509, 511 (Ky. Ct. App. 1987) ("A contract between parties dealing in oil and gas is subject to the same rules of construction as any ordinary contract, and courts will not undertake to write a different contract or alter terms where the parties' intent is clearly expressed.").

Poplar Creek attempts to distinguish *Lafitte* by arguing that, "[j]ust like *Raines*, *Reed* and *Warfield*, *LaFitte* [sic] involved sales of gas at or in the vicinity of the wellside, and in each case the royalties were valued on the basis of the wellside sales." (footnotes omitted). "This[,]" Poplar Creek argues, "is in stark contrast to the case at bar where there are no sales at the wellside . . . ." But nothing in *Lafitte* indicates that its holding was limited to cases involving wellside sales. Indeed, in *Lafitte*, the district court focused on where the gas was produced, not sold (wherever that might be), to determine the correct royalty payment:

> The lease provides that the gas is to be sold 'for not less than the fair wholesale market value of the same in the vicinity' of the leased premises. I must conclude that 'vicinity' means the vicinity of the wellhead where the gas is produced and not the vicinity or vicinities where it is delivered or sold by the lessee.

*Lafitte Co.*, 177 F. Supp. at 61.

The district court's ruling also finds support in the well-reasoned opinion of the Court of Appeals of Kentucky (at that time, Kentucky's highest court) in *Cumberland Pipe Line Co. v. Commonwealth*, 15 S.W.2d 280 (Ky. 1929). In *Cumberland Pipe Line*, the issue was whether a state tax levied on the "market value" of all crude petroleum produced in Kentucky violated the Interstate Commerce Clause of the United States Constitution. *Id.* at 281. Because the point of sale was often outside of Kentucky, Cumberland Pipe Line argued that the tax was an unconstitutional burden on interstate commerce. *Id.* at 282-83.

The *Cumberland Pipe Line* court found that the tax was levied at the point of production and was, therefore, constitutional. *Id*. at 283-84. The court further noted that

the market value upon severance (at the well) could be calculated by using the market

price at the point of sale, then deducting the costs incurred to get the gas to the market,

stating that:

> The state tax commission must find the market value from monthly reports showing sales of such crude petroleum and certain other details (section 5), and from such other reports and information as it may secure (section 6), but the commission is directed to make an appropriate allowance for the cost of transportation from the producing wells to the market (section 6).  This does not mean that the amount of the occupational tax is to be measured by the value of the oil in the hands of the transporter.  It requires that the value at the wells shall be ascertained from the evidence of the market value after the oil has completed its journey through the channels of commerce and has been sold in the market.  It is but a means adopted and prescribed to find the market value of the oil at the well where it was produced.  *There is seldom, if ever, a market at the place of production.  The product must be carried to the markets.  The value at the place of production is the selling price less the cost of transportation to the place of sale.*

*Id.* at 284 (emphasis added).

In so holding, the court recognized that this was not a new method of calculation,

"but conform[ed] to the legal rules of evidence for the ascertainment of market value."

*Id.*  Indeed, Kentucky cases concerning coal and timber had previously recognized that:

> The market value of a commodity is its selling price in the usual and ordinary course of business, but, if there be no market at a particular place at which it is desired to fix the market value, then the market value is taken at the nearest point available, with adjustments to care for the cost of transportation to that market.

*Id*. (citing *Campbellsville Lumber Co. v. Bradlee & Wiggins*, 29 S.W. 313 (Ky. 1895);

*Log Mountain Coal Co. v. White Oak Coal Co.*, 174 S.W. 721 (Ky. 1915)).

Poplar Creek agrees that *Cumberland Pipe Line* stands for the proposition that

a lessee may deduct the lessor's share of transportation costs from the royalty payment,

but argues that the post-production costs at issue in this appeal do not constitute such

costs.  We fail to see, however, how gathering, compression, and treatment expenses are

materially distinguishable from "transportation" costs.  At least two of these expenses, gathering and compression, are clearly necessary to transport gas.  The third cost, treatment, increases the value of that gas at its final destination.  *Cumberland Pipe Line* therefore strongly suggests that Kentucky courts would deduct such costs from the market price in order to determine the gas's value at production.

Based on this court's previous decision in *Lafitte Company v. United Fuel Gas Company*, and our review of Kentucky law, we hold that Kentucky follows the "at-the-well" rule, which allows for the deduction of post-production costs prior to paying appropriate royalties.  We further hold that "at-the-well" refers to gas in its natural state, before the gas has been processed or transported from the well.  The gas sold by Chesapeake was therefore not "sold at the well" within the meaning of the parties' lease.  Accordingly, Chesapeake was within its rights, under Kentucky law and the parties' agreement, to subtract gathering, compression, and treatment costs before paying royalties on the market value of the gas.  Accordingly, we affirm the district court's judgment.

### III.

Next, we turn to the district court's approval of the settlement in the *Thacker* action.  On appeal, the Poplar Creek Objectors argue that the settlement agreement is not "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  To determine whether a settlement agreement satisfies Rule 23's standard, courts in this circuit are required to consider:  "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."  *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).  "The acceptance of a settlement in a class action suit is discretionary with the [district] court and will be overturned only by a showing of abuse of discretion."  *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981).

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.  The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured."[6] *In re Gen. Tire & Rubber Co. Sec. Litig*., 726 F.2d 1075, 1086 (6th Cir. 1984) (citations omitted).  "Even the denial of all relief to the information class might be justified if careful scrutiny indicated that the class had no realistic prospect of sufficient success to enable an actual distribution to the class members." *Mirfasihi v. Fleet Mortg. Corp*., 356 F.3d 781, 785-86 (7th Cir. 2004).

As noted above, the Poplar Creek Objectors concede that affirmance in the *Poplar Creek* action would leave them with no viable challenge to the *Thacker*-action settlement.  Having concluded that judgment in favor of Chesapeake was proper on Poplar Creek's claims, there is nothing unfair or inequitable regarding the provisions of the *Thacker*-action settlement releasing such claims.  Accordingly, we hold that the district court did not abuse its discretion in approving the settlement.

IV.

For these reasons, we affirm the district court's judgment in 09-5914 and its settlement order in 10-5373.

---

[6]Indeed, as NiSource and Energy Group note, "[i]f the Thacker case had not settled in advance of the dismissal of [the] Poplar Creek [action], there is a high likelihood that the class members would have received nothing."