NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0505n.06

Case No. 20-2062

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| WHIRLPOOL CORPORATION, | ) | **FILED** |
|  | ) | Nov 04, 2021 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| EQUITY MANAGEMENT, INC., | ) | MICHIGAN |
|  | ) |  |
| Defendant-Appellant. | ) |  |

_____/

Before: GUY, COLE, and STRANCH, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Equity Management, Inc. (EMI), a company in the business of corporate trademark licensing, appeals from the entry of judgment in favor of Whirlpool Corporation declaring—as a matter of law—that EMI did not have a right to share in royalties from a new 2019 License Agreement between Whirlpool and Nortek Global HVAC, LLC. On appeal, EMI contends that its rights under its Representation Agreement with Whirlpool unambiguously reach the 2019 Nortek License or, at a minimum, that its rights could not be determined on a Rule 12(c) motion for judgment on the pleadings. *See* FED. R. CIV. P. 12(c). EMI also argues that, notwithstanding its own cross-motion, it was error for the district court to have entered judgment against it on its counterclaim for breach of contract. Finding no error, we affirm.

I.

Founded by former advertising executive Glen Konkle, EMI is described as "an industry pioneer" in corporate trademark licensing "representing some of the most recognized brands in the United States." EMI began representing the Maytag Corporation and, in 2002, EMI secured a license agreement between Maytag and Nordyne, Inc. (Nordyne License). With that, in 2003, EMI and Maytag entered into an integrated Representation Agreement that granted EMI broad responsibility to develop, negotiate, and manage "relationships with third parties who use Maytag-owned trademarks to manufacture and distribute licensed products." (R. 60.)

But in 2006, Whirlpool acquired Maytag. In December 2006, Whirlpool and EMI executed two agreements: (1) a First Amendment to the Representation Agreement limiting EMI's representation to certain licenses (Amendment); and (2) a separate Licensing Representation Agreement that gave Whirlpool sole discretion whether to use EMI for other licensing projects (LRA). (R. 61, 62.) The 2003 Agreement had a term of five years, with a renewal for five more years if certain conditions were met. That term was extended twice—by the First Amendment in 2006 and a Second Amendment in 2010—and the Agreement finally expired on December 31, 2015.[1]

In the 2010 Amendment, EMI and Whirlpool also agreed "to modify their respective sharing of the royalties generated by the Nordyne License." That was followed by an amendment to the Nordyne License, which, among other things, adjusted its renewal terms again. That is, the Nordyne License would expire after an "Initial Term," "unless sooner terminated or renewed as provided in this LICENSE." Also, Nordyne could automatically renew the license for two

---

[1] The LRA expired in 2009. Its terms are not directly relevant to this dispute.

successive three-year terms (First and Second Renewal Term) if certain conditions were met.  No

further renewal would follow, however:

> In any event, this LICENSE shall expire on December 31, 2018 and shall not automatically be renewed pursuant to this LICENSE.  If the parties desire to continue licensing the Marks after expiration of this LICENSE, any understandings between the parties regarding the further licensing of the Marks must be set forth in a new license agreement.  Neither party is obligated to enter into a new license agreement.

So, as of 2010, the Nordyne License had an expiration date and required that any continuation of

the license would have to be set forth in a "new license agreement."  Those provisions were not

affected by any of the subsequent amendments, the last of which accounted for Nordyne's name

change to Nortek Global HVAC, LLC.  (R. 66, 67, 68.)  The Nordyne/Nortek License continued

through both Renewal Terms and was "scheduled to expire at the end of 2018."  (Counterclaim,

Para. 34.)   All indications are that, despite the earlier expiration of EMI's agreement with

Whirlpool, EMI continued to share in the revenues that the Nordyne/Nortek License generated

until December 31, 2018.  (Whirlpool Br., p. 11 n.4.)  Certainly, EMI has not suggested otherwise.

EMI's counterclaim alleged that before the Nordyne/Nortek License expired, EMI was

heavily involved in discussions regarding a continuation of the license in the form of another

renewal.  All discussions ceased, however, when EMI rejected Whirlpool's proposed reductions

in revenue sharing and the Nordyne/Nortek License expired by its terms on December 31, 2018.

Instead, Whirlpool and Nortek entered into a new License Agreement for the use of the Maytag

trademarks effective January 1, 2019 (2019 Nortek License).  (R.69.)  Whirlpool took the position

that EMI had no rights with respect to the new 2019 Nortek License.  EMI objected and responded

by retaining and refusing to turn over royalty revenues for Q4 of 2018 and Q1 of 2019.  Whirlpool

commenced this declaratory judgment action, which alleged in part that EMI's retention of those

funds constituted breach of contract, conversion, and/or unjust enrichment (R.45, Counts II-IV).

The district court found in Whirlpool's favor on those claims, and EMI does not challenge that portion of the decision on appeal.[2]

Whirlpool also sought declaration that it was not in breach of its Agreement with EMI (Count I). EMI's counterclaim alleged that Whirlpool had breached their Agreement by negotiating, completing, and refusing to recognize EMI's right to revenue generated under the 2019 Nortek License (PageID 256-57.) Whirlpool moved for judgment on the pleadings in its favor, while EMI's response sought partial summary judgment against Whirlpool on its counterclaim "with only the issue of damages remaining." Finding no ambiguity, the district court determined that EMI's rights and obligations under its Representation Agreement with Whirlpool—including a right to continue collecting royalties from Nortek—expired with the Nordyne/Nortek License on December 31, 2018. Granting Whirlpool's motion and denying EMI's, the district court entered judgment in favor of Whirlpool on both its complaint and EMI's counterclaim. This appealed followed.

II.

We review the district court's grant of judgment on the pleadings under Rule 12(c) under the same de novo standard that applies to an order of dismissal under Rule 12(b)(6). *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 240 (6th Cir. 2011). A Rule 12(c) motion must be converted to one for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." *Clark v. Stone*, 998 F.3d 287, 296 (6th Cir. 2021). A court may, however, properly consider documents that are attached to the pleadings, as well as public records, matters in the record of the case, and exhibits attached to the motion so long as they are "referred

---

[2]Whirlpool also represents that the dispute over those retained funds has been resolved out of the appeal bond, but that would not matter since any argument EMI might raise has been abandoned.

to in the complaint and are central to the claims contained therein." *Id*. (brackets omitted) (quoting *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015)). Here, the district court adhered to this requirement, noting that the agreements and correspondence it considered "were attached to and/or referenced in the pleadings in this breach-of-contract case." So, for purposes of the cross-motions here, all well-pleaded material allegations of the opposing party must be taken as true, and the motion is properly granted only if the moving party is clearly entitled to judgment as a matter of law. *Poplar Creek*, 636 F.3d at 240; *see also Jackson v. Prof'l Radiology, Inc.*, 864 F.3d 463, 465-66 (6th Cir. 2017).

## A.

The parties agree that the Representation Agreement between EMI and Whirlpool provided that it is to be "governed by, and construed in accordance with, the laws of the State of Illinois." There is also no dispute concerning the familiar principles of contract interpretation to be applied under Illinois law. "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007); *see also Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). When, as here, "parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misrepresentations which might arise from extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999).

A court must look first to the language of the contract alone, "as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher*, 874 N.E.2d at 58. In doing so, the contract must be construed as a whole, and "intent is not determined by viewing a clause or provision in isolation." *Thompson*, 948 N.E.2d at 47. Nor is a contract rendered ambiguous "merely because the parties disagree on its meaning." *Id*. at 48. "Whether

the contract is ambiguous is an issue of law." *Fleet Bus. Credit, LLC v. Enterasys Networks, Inc.*, 816 N.E.2d 619, 630 (Ill. Ct. App. 2004).

Although the Representation Agreement, as amended, expired in December 2015, it explicitly contemplated that EMI would have certain continuing rights and obligations. Specifically, as is pertinent here, § 10(c) of the 2003 Agreement provided for a continued period of revenue sharing after the Agreement expired.

> Upon expiration of this Agreement or termination other than [for cause], Maytag shall pay EMI according to the sharing rates . . . against Gross Royalty Revenues and Other Revenues *from License Agreements generated from EMI's efforts hereunder (as such may be renewed, reinstated, modified or extended* by the licensee at any time before or after termination or expiration) beginning on the date of expiration or termination and continuing for the period during which such revenues from such parties are generated, but (i) with respect to any Existing License Agreement [*i.e.*, the Nordyne License], *not to exceed* twenty (20) years after the date the 1993 Agreement would have otherwise expired (i.e., March 31, 2004), and (ii) with respect to any New License Agreement, not to exceed twenty (20) years after the effective date of such New License Agreement.

(2003 Agreement, § 10(c) (emphasis added).) First, EMI imprecisely describes this right to continued compensation with respect to the Nordyne License as continuing *until* March 31, 2024. Rather, the clear meaning of the "not to exceed" language is that any right to share in revenue would not continue *beyond* March 31, 2024. Second, as this implies, EMI's right to compensation is contingent on there being revenue "from License Agreements generated from EMI's efforts . . . as such may be renewed, reinstated, modified or extended." The issue, then, is what license agreements the parties intended that this provision would cover.

EMI leans heavily on § 10(c)'s use of the term "License Agreement," which was defined to "mean the written agreement originally obtained through EMI's efforts or administered by EMI (*including amendments, renewals, extensions, reinstatements, modifications, addenda, and the like*) between Maytag [or Whirlpool as its successor] and a Licensee, relating to the Licensed Products, and shall include Existing License Agreements and New License Agreements." (2003

Agreement, § 1(i) (emphasis added).) EMI contends that the broad sweep of the "litany of continuations" language included in this definition meant that the Agreement covers any written agreement that continues a licensing relationship with the same party for the use of the same mark in the same product category. Whether this is so—or is at least ambiguously so—does not matter because we agree with the district court that reliance on this definition to determine the scope of EMI's rights would be inconsistent with the changes that EMI and Whirlpool made in the 2006 Amendment.

Resisting that conclusion, EMI points to the fact that the Amendment expressly carried over the meaning of "capitalized terms" such as "License Agreement" and "Existing License Agreement." What the Amendment actually said is that "capitalized terms used in this Amendment shall have the meanings given to them in the Representation Agreement"—"[u]nless otherwise defined herein." In fact, the Amendment stated quite clearly in § 7 that: "Any capitalized terms *that continue to apply* in light of the amendments made herein *that are not defined in this Amendment* shall have the same definitions set forth in the Agreement." (2006 Amendment, § 7 (emphasis added).) Section 7 also provided that "[t]he Agreement, in its limited form as amended by the Amendment, remains in effect," and "[a]ny conflict between this Amendment and the Agreement shall be controlled by this Amendment."

So what did the Amendment change? Quite a bit, as it turns out. The Amendment explained the parties' intentions as follows:

> Whirlpool is creating an internal licensing function that will engage in licensing intellectual property independent of EMI. *The parties wish to amend the Agreement to limit EMI's representation to the Maytag 2006 Agreements as described herein.* Concurrent with the execution of this Amendment, Whirlpool and EMI are executing a separate additional Licensing Representation Agreement ("Whirlpool Representation Agreement"), which will allow Whirlpool, at its discretion, to use EMI for projects that it chooses not to conduct through its internal licensing function.

(Emphasis added.)  More specifically, the Amendment stated that "the Agreement shall continue to apply only to the Maytag 2006 Agreements and EMI shall only continue as the exclusive representative for the Intellectual Property under the Agreement with respect to the Maytag 2006 License Agreements."  (Amendment, § 1.)  Also, "other than with respect to the Maytag 2006 License Agreements, Whirlpool may use Whirlpool's internal licensing organization to develop and enter into new licenses without being required to compensate EMI with respect to such new licenses." (Amendment § 1(b).)  The parties confirmed that EMI would "continue to have the right to receive compensation for the Maytag 2006 License Agreements in accordance with Sections 6 and 10 of the Agreement."  (Amendment § 3.)

These provisions unambiguously restricted the scope of the Representation Agreement to the "Maytag 2006 Agreements," which were, in turn, specifically defined in the Amendment.

> EMI has developed, is managing, and is being compensated for nine (9) License Agreements, as listed on Schedule A, which Schedule is made part of this Amendment *(such License Agreements, including renewals, modifications, or other amendments to them, such as an expansion of a product line within a product category, are hereinafter referred to as the "Maytag 2006 License Agreements.")*

(Emphasis added.)  For six of the nine Maytag 2006 License Agreements, EMI agreed that Whirlpool could "alter, amend, or terminate" them without being obligated to compensate EMI even if "such action results in the cessation of royalty payments."  For the other three Maytag 2006 Agreements, including the Nordyne License, Whirlpool agreed to support EMI in their development and management in the ways described in that section "for the periods specified therein."  (Amendment, § 6.)  With respect to the Nordyne License specifically, the parties agreed "to work together to maintain and develop the license for its current term and its renewal term." (Amendment, § 6(a).)  And those obligations would "survive the expiration or termination of the Agreement and shall continue for the current term and renewal term of the Nordyne License." (Amendment, § 6(a)(iii).)  These provisions were not altered by the Second Amendment between

EMI and Whirlpool in 2010, which extended the term and modified their revenue sharing from the Nordyne License.

Construing the Agreement as a whole, we find that the 2006 Amendment unambiguously limited the scope of the Representation Agreement, including § 10(c), to the Maytag 2006 License Agreements. EMI's suggestion that the definitions of License Agreement and Maytag 2006 License Agreements are simply "redundant" is not colorable in the context of the Agreement as a whole. *See, e.g.*, *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (applying Illinois law) (explaining that "when parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things"). Consequently, we agree with the district court that EMI had no rights with respect to the 2019 Nortek License unless it was intended to be a "renewal, modification, or other amendment" of the expired Nordyne/Nortek License.

To answer whether the agreement was nonetheless a renewal or modification of the prior agreement, the district court drew on the analysis employed in *Cingular Wireless LLC v. Ahmad*, 500 F. Supp. 2d 917 (N.D. Ill. 2007). There, the issue was whether a guaranty entered into in connection with the agreement between Cingular and a buyer unambiguously extended to a subsequent agreement entered into with that same buyer. *Id*. at 918. Cingular argued that it did because the second agreement was simply a renewal or modification of the first agreement. *Id*. at 919. In concluding that the second agreement was not a renewal or modification, the court found the guaranty itself was tied to the first agreement; the first agreement had a renewal mechanism that was not exercised; and the later agreement stated that it superseded all prior agreements. *Id*. at 919-20. The court found further support in the fact that the terms of the first and second agreements were significantly different—including, differences in the terms, pricing structure, the

addition of an arbitration clause, and a change in the law to govern the agreement. *Id*. at 920. EMI is right to argue that the contract language here is entirely different from the provisions at issue in *Cingular*. (EMI's Reply, p. 9.) The decision is not, however, without illustrative value.

On its face, the 2019 Nortek License was a new agreement—unlike each of five Amendments of the 2002 Nordyne License. (R. 63, 64, 65, 66, 67, 68.) The 2019 Nortek License included an express merger and integration clause. Further, the Nordyne/Nortek License, as last amended, allowed for only two renewal terms; provided an express expiration date; and provided specifically that any continuation of the license after that expiration date "must be set forth in a new license agreement." If that were not enough, comparison between the 2002 Nordyne/Nortek License, as amended, and the 2019 Nortek License support the conclusion that the new license agreement was not intended to be a "renewal, modification, or other amendment" of the expired license. Nor was it error for the district court to consider the differences between them, including different compensation terms, warranty length, term of the agreement, and provisions for stricter oversight of the approval process.[3]

Taking the pleadings as true, we agree with the district court that the unambiguous language in the relevant agreements makes clear that EMI had no rights or obligations with respect to the 2019 Nortek License because its rights with respect to the Nordyne/Nortek License (one of the Maytag 2006 License Agreements) expired with it on December 31, 2018. Whirlpool was entitled to judgment on the pleadings in its favor declaring as much. That leaves EMI's remaining

---

[3] The district court also considered the change in the governing law to be another significant difference. *See Cingular*, 500 F. Supp. 2d at 920 (suggesting the meaning of all terms were altered because they "took on the meaning and legal ramifications accorded to them under Georgia law rather than Illinois law"). We place no weight on this change where there is no reason to think the same terms would have different meanings as a result of the change in the governing law from Illinois to Michigan.

assertion that the district court erred by entering judgment in Whirlpool's favor on its counterclaim as well.

### B.

EMI asserts a procedural error in the district court's determination that it had resolved all pending claims in the case. Whirlpool was granted judgment on the pleadings declaring that EMI had no further rights or obligations under the Representation Agreement, including the right to continue collecting royalties, after December 31, 2018. EMI's opposition to Whirlpool's motion asked the district court to "enter judgment for EMI and against Whirlpool on the Amended Complaint claims and enter partial summary judgment in EMI's favor and against Whirlpool on liability on EMI's Counterclaim, with only the issue of damages remaining." This would understandably have caused the district court to believe that the question of liability on EMI's counterclaim for breach of contract was properly before it.

EMI argues on appeal, however, that its breach-of-contract claim included allegations that were not resolved by the district court's decision. To be sure, EMI's First Cause of Action alleged that Whirlpool had "breached the contract as discussed above, including, but not limited to," the several ways alleged in Paragraph 48(a)-(f). EMI does not dispute that the first of those ways— refusing to acknowledge EMI's right to compensation for the "renewal and extension of the Nordyne agreement"—was fully litigated before the district court. Two other allegations rely directly on this right: acting unreasonably and without good faith in seeking to deny EMI compensation under that agreement; and depriving it of an opportunity to recover deferred compensation under that agreement. (Counterclaim, Para. 48(c), (f).) There can be no question that these theories were squarely decided by the district court.

The three other allegations of breach of contract concerned Whirlpool's completion of the 2019 Nortek License without EMI's involvement. (Counterclaim, Para. 48(b)-(d).) EMI argues on appeal that these allegations were "based on section 6(a) of the 2006 [A]mendment, separate and apart from EMI's right to continue compensation after 2018." (EMI's Br., p. 38.) How that might be the case is conspicuously absent from EMI's arguments on appeal. More importantly, EMI sought judgment of liability in its favor on its counterclaim without suggesting it had a separate yet to be resolved ground for its counterclaim. Also, although EMI had made allegations regarding the aborted negotiations with Whirlpool and Nortek, EMI did so to show that the 2019 Nortek License was a renewal. (PageID 868, n.3.)

EMI faults the district court for not recognizing a breach of contract theory that it failed to pursue in seeking judgment of liability in its favor on its counterclaim. We find that EMI forfeited this argument by not raising it in the district court. *See Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014). Even if that were not the case, the doctrine of invited error would prevent EMI from complaining about the district court's failure to do so. *See Smith v. General Motors LLC*, 988 F.3d 873, 879-80 (6th Cir. 2001) ("invited error prevents a party from inducing a court to follow a course of conduct" and then later relying on the error to set aside the consequences of that error (citation omitted)).

\*       \*       \*

The district court's judgment is **AFFIRMED**.