**In re: APPALACHIAN LAND COMPANY**

v.

**EQT PRODUCTION COMPANY**

2013–SC–000598–CL

Supreme Court of Kentucky.

RENDERED: AUGUST 20, 2015

Counsel for Appalachian Land Company: George E. Stigger, III, John C. Whitfield, Madisonville

Counsel for EQT Production Company: Gregory Lee Monge, Kimberly McCann,

Ashland, Keri E. Lucas, Christina Ditty Hajjar, Ashland

Counsel for Kentucky Oil and Gas Association, INC.: Karen J. Greenwell, Gregory Brian Wells, Lexington

United States Court of Appeals for the Sixth Circuit: Deborah S. Hunt

### CERTIFYING THE LAW

## OPINION OF THE COURT BY JUSTICE CUNNINGHAM

Today we certify that the producer severing natural gas from the earth is solely responsible for the payment of the severance tax. Of course, this rule can be altered through agreement.

On the first day of December, 1944, widower Robert Williams surrendered the privilege of severing oil and gas from his land in Pike County to West Virginia Gas Company. He leased all oil and gas within his property to the gas company "for the sole and only purpose of operating for, producing and marketing oil, gas and gasoline . . . ."

Appalachian Land Company, ("Appalachian") is Mr. Williams' successor in interest as the lessor. EQT Production Company, ("EQT") is a natural gas producer. It is the successor in interest to the original lessee, West Virginia Gas Company. The lease provides that the lessee, now EQT, shall pay the lessor, now Appalachian, a royalty on natural gas extracted from the land "at the rate of one-eighth (1/8) of the market price of gas at the well." In 2008, Appalachian filed a class action law suit against EQT in the U.S. District Court for the Eastern District of Kentucky. Appalachian claimed that EQT underpaid royalties owed to Appalachian in exchange for natural gas EQT acquired from Appalachian's land.

The disputed issue arises from the fact that natural gas is not sold "at the well." As such, lessees like EQT must mathematically work back from the price at the point of sale to arrive at the wellhead price. This is the relevant "market price" for purposes of calculating royalties. In the present case, this value was obtained by deducting from the sale price all post-extraction processing costs; transportation costs; and all severance taxes. EQT then paid Appalachian one-eighth of the remainder.

Appalachian argued before the district court that in arriving at a "market price" for royalty purposes, EQT should not have deducted the severance taxes. Appalachian contends that these allegedly improper deductions resulted in an underpayment of royalties. The court disagreed and entered judgment on the pleadings in favor of EQT. Appalachian moved the court to alter or amend that judgment, which was denied. Appalachian appealed those rulings.

Because the issue of apportionment of natural gas severance taxes has not been directly addressed by this Court, the Sixth Circuit Court of Appeals certified the following question pursuant to CR 76.37(1):

> Does Kentucky's "at-the-well" rule allow a natural-gas processor to deduct all severance taxes paid at market prior to calculating a contractual royalty payment based on "the market price of gas at the well," or does the resource's at-the-well price include a proportionate share of the severance taxes owed such that a processor may deduct only that portion of the severance taxes attributable to the gathering, compression and treatment of the resource prior to calculating the appropriate royalty payment?

While we accept the invitation to clarify this important issue, we reject the two options presented. Instead, we conclude

that in the absence of a specific lease provision apportioning severance taxes, lessees may not deduct severance taxes or any portion thereof prior to calculating a royalty value.

### Background

The extraction of natural gas is a capital intensive process involving various technologies and extraction methods. After extraction, the gas is cleaned, stored, and subsequently transported to other sites through various pipelines. Often after additional cleaning, refining, and processing, the gas is eventually sold at a hub location. The severance tax is remitted at this point of the operation. KRS 143A.060(2). The sales price at that location constitutes the gross value of the gas for purposes of calculating the severance tax. KRS 143A.010–020. Royalty payments are calculated based on this sale price.

■ In *Baker v. Magnum Hunter Production, Inc.,* —— S.W.3d ——, 2015 WL 4967131 (Ky. August 20, 2015), we recently held that Kentucky follows the majority "at the well" rule for determining royalty payments. Our decision confirms the Sixth Circuit's interpretation of Kentucky law. *Poplar Creek Development Co. v. Chesapeake Appalachia, LLC,* 636 F.3d 235 (6th Cir.2011). Under the "at the well" approach, production costs *are not* deducted from the sale price for royalty calculation purposes. Production costs include bringing the gas to the surface, exploration, drilling, and well-maintenance costs. In other words, production costs are those associated with "severing" the gas from the earth. In contrast, post-production costs *are* deducted from the sale price when calculating royalty payments. Post-production costs are incurred after the gas is severed and reaches the wellhead. These costs include improving the quality of the gas and transporting it to the point of sale.

### Analysis

Although the "at the well" rule is a critical component of our oil and gas jurisprudence, it is not conclusive of the narrow issue currently before this Court—nor are economic considerations determinative here. Rather, we must decide whether Appalachian's severance tax liability arises under statute or contract. Having reviewed the facts and the law, we conclude that there is no severance tax liability on behalf of Appalachian. We keep in mind that Appalachian is simply the successor to Mr. Williams—the landowner under the 1944 lease—and is not in the business of extracting a profitable mineral from the earth or bringing it to market.

#### Statutory Liability

KRS 143A.020(1) states that "[f]or the privilege of severing or processing natural resources in this state, a tax is hereby levied at the rate of four and one-half percent (4.5%) on natural gas … to apply to the gross value of the natural resource." This tax applies to "all taxpayers severing and/or processing natural resources in this state...." KRS 143A.020(2). "Severing" is defined as "the physical removal of the natural resource from the earth or waters of this state by any means." KRS 143A.010(3). " 'Processing' includes but is not limited to breaking, crushing, cleaning, drying, sizing, or loading or unloading for any purpose." KRS 143A.010(6). With these provisions in mind, we turn to *Burbank v. Sinclair Prairie Oil Co.,* which addressed a nearly identical issue. 304 Ky. 833, 202 S.W.2d 420 (1946).

*Burbank* involved a dispute between a lessee and lessor concerning the apportionment of the oil severance tax assessed under the original version of what would become KRS 137.120. The consideration

provided in the lease at issue in that case was "the equal of 1/8 part of all oil produced and sold from the leased property." *Id.* at 421. Similar to the present case, the lease in *Burbank* did not provide for apportionment of severance taxes.

The Court focused its analysis on the original severance tax statute that provided in pertinent part:

> Every person, firm, corporation and association engaged in the business of producing oil in this State, by taking same from the earth, shall, in lieu of all other taxes on the wells producing said oil imposed by law, annually pay a tax *for the right or privilege of engaging in such business* . . . .[1]

*Id.* at 422 (citing 1917 Ky. Acts Chapter 9, Section 1) (emphasis added).

Based on this plain language, the Court held that "the original act as amended cannot be construed as placing any part of the tax in question on one who is simply a royalty owner." *Id.* at 425.

The *Burbank* Court's determination was well-founded. For example, the Court noted that in "States having similar acts . . . the courts have held the tax not to extend." *Id.* at 424 (citing *State of Oklahoma v. State of Texas*, 266 U.S. 298, 300, 45 S.Ct. 101, 69 L.Ed. 296 (1924) (holding that a royalty owner was not liable under a pre–1933 law that taxed all those engaged in "producing" crude oil)). *Burbank* also relied upon the U.S. Supreme Court's decision in *Oliver Iron Mining Co. v. Lord*, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929 (1923). In that case, the Court considered a Minnesota law that taxed "every person engaged in the business of mining or producing iron ore . . . ." *Id.* In holding that the royalty owner was not liable for the tax or any portion thereof, the Court cogently observed:

> [t]he tax in its essence is . . . an occupation tax. It is not laid on the land containing the ore, nor on the ore after removal, but on the business of mining the ore. . . .

*Id.* at 176–77, 43 S.Ct. 526.

Like the royalty owners in *Burbank* and *Oliver*, Mr. Williams and his successor, Appalachian, have not engaged in the business of *producing* natural gas. *Burbank*, 202 S.W.2d at 423. It is similarly evident that the only party to the lease that engages in *severing* the gas is EQT. *Cf. Cimmaron Coal Corp. v. Dep't of Revenue*, 681 S.W.2d 435, 437 (Ky.App.1984) ("A mineral owner who leases his coal to a severer of coal is not 'engaged in severing' that coal."). EQT is also the only party to the lease involved in bringing the gas to market and, thus, *processing* the gas. *See Burbank*, 202 S.W.2d at 423 ("There can be no doubt but that the Legislature had in mind that the person, firm, etc., making it his or its business to drill, *bring in the oil and put the product on the market*, should bear the tax.") (Emphasis added). Therefore, royalty owners are not involved in severing *or* processing the gas.

Furthermore, it is critical to our analysis that the natural gas tax is assessed for the "*privilege* of severing or processing" the gas. This is a privilege Mr. Williams surrendered over seventy years ago. Absent a clear legislative directive to the contrary, the *privilege* to deplete this non-renewable resource and bring it to market is most logically bestowed upon the producer—not the passive lessor from whose land the resource is being severed.

---

1. In 1918, the legislature reenacted the 1917 Act and amended it to include a provision clarifying how the tax was to be assessed and collected. KS 4223c–3. However, the 1918 Act "did not indicate any change in the purpose of the original act." *Burbank*, 202 S.W.2d at 422.

■ In exchange for a royalty interest in any gas extracted, Mr. Williams conveyed his right to extract the gas to West Virginia Gas Company. Appalachian and EQT succeeded to those respective property rights. In the present case, title to the gas became vested with EQT the moment it brought the gas to the wellhead.[2] Therefore, even viewing the severance tax as analogous to a property tax, the owner of the property being taxed is EQT, not Appalachian. As such, whether we interpret the severance tax as a levy on the privilege of producing gas, the business of producing gas, or on the gas itself, the tax burden lies squarely with EQT.

EQT asserts that other "at the well" jurisdictions have reached a contrary determination, thus holding that lessees may deduct severance and processing taxes prior to calculating royalties. Unlike the present case, however, the weight of the authority cited by EQT and Amicus Curiae, Kentucky Oil and Gas Association, Inc., involves state statutes that specifically provide for the payment of severance taxes by the royalty owner. *E.g., Cartwright v. Cologne Production Co.,* 182 S.W.3d 438 (Tex.App.2006); *Brown v. Shell Oil Co.,* 128 Mich.App. 111, 339 N.W.2d 709 (1983). These cases are readily distinguishable from the current case.

For example, the statute at issue in *Cartwright* imposed a tax on each producer of gas that expressly included royalty owners. *Cartwright,* 182 S.W.3d at 446 (citing TEX. TAX CODE ANN. § 201.001) (defining producer as "a person who owns an interest, *including a royalty interest,* in gas or its value....") (Emphasis added). In sharp contrast, the Kentucky General Assembly has specifically excluded from its definition of taxpayer under KRS Chapter 143A "[a] party ... who only receives an arm's length royalty." KRS 143A.010(4)(b). Since Appalachian receives only a royalty payment under the lease at issue here, it has no economic interest in the gas for purposes of the severance tax assessed under KRS 143A.020.

If the General Assembly determines that KRS Chapter 143A should be amended to include royalty owners, it may certainly do so in a manner that otherwise comports with state and federal law. For example, after *Burbank* was rendered, the General Assembly promptly amended KRS 137.120 to impose the tax "ratably upon all persons owning any interest in such oil." 1948 Ky. Acts Chapter 82, Section 1 (H.B. 297). In the absence of any similar legislative action regarding KRS Chapter 143A, we must read the relevant portions of that Chapter in accordance with their plain meaning and with guidance from *Burbank.* Accordingly, royalty owners such as Appalachian are not subjected to the severance tax presented in KRS Chapter 143A.

It is critical to note that the dissent concedes the following: 1) Appalachian does not engage in the business of severing or processing the gas; 2) EQT is the "taxpayer" pursuant to the statutory definition; and 3) that royalty owners are specifically excluded from that statutory definition. Therefore we are speaking unanimously on the issue posed by the Sixth Circuit concerning the "intent" of the Kentucky severance tax statute. Yet, the dissent maintains that despite the statute's clear intent, its "reach" extends 71 years

---

2. *See* Mikal C. Watts & Emily C. Jeffcott, *Does He Who Owns the "Minerals" Own the Shale Gas? A Guide to Shale Mineral Classification,* 8 Tex. J. Oil Gas & Energy L. 27, 36 (2012–2013) ("Kentucky follows the rule of capture, which provides that fugacious minerals, such as oil and gas, cannot be "owned" until produced and possessed.") (citing *Bowles v. Hopkins County Coal, LLC,* 347 S.W.3d 59, 65 (Ky.App.2011)).

into the past in order to imply contractual terms that were never bargained for by the original parties to the lease. Through the lens of equity, the dissent reads KRS Chapter 143A and the lease together, only to arrive at a conclusion that contradicts both.

### Contract Liability

KRS Chapter 143A was enacted in 1980, 36 years after the lease was executed. Prior to 1980, the Commonwealth did not tax the severance or production of natural gas under any other statute or regulatory provision. Therefore, the original parties to the lease could not have intended the apportionment of gas severance taxes at the time the lease was executed.

In this regard, the present case can be distinguished from *Burbank*, where the oil severance tax statute preceded the lease that was executed by the parties in 1942. *See* KS 4223c–1. As such, the contracting parties in *Burbank* would have been aware of the existence of such a tax and may have intended apportionment.

Nevertheless, the *Burbank* Court concluded that while the 1942 lease created a joint interest in the proceeds resulting from the sale of the oil, the lessor had no say in the "operation and management...." *Burbank*, 202 S.W.2d at 422–23. The Court accordingly held that the lessor/royalty owner was not statutorily liable *or* contractually liable for the oil severance tax. As previously discussed, the Court based its analysis on a statute and pertinent contractual provisions that are nearly identical to those at issue in the present case. Compare *Poplar Creek Development Co.*, 636 F.3d at 242 n. 5 (where the lease expressly provided that "lessee must pay all taxes on gas produced under the lease, except with respect to the one-eighth royalty paid to the lessor[ ]....").

However, EQT, Amicus, and the dissent give short shrift to the application of *Bur-*

*bank*. They simply argue that the "at the well" rule did not apply in that case. Amicus specifically opines that, "[u]nlike gas, oil was and is typically sold at-the-wellhead." *See Burbank*, 202 S.W.2d at 422 (citing KS 4223c–3) ("The tax provided by this section shall be imposed and attached when the crude petroleum is first transported from the tanks or other receptacle located at the place of production."). As previously noted, however, the purpose of that amendment "was merely curative and clarifying as to the method of reaching the quantity and value...." *Burbank*, 202 S.W.2d at 422. This method does not negate application of the "at the well" rule in oil cases such as *Burbank*.

For example, *Cumberland Pipe Line Co. v. Commonwealth* specifically applied the "at the well" rule in the context of the oil severance tax statute. 15 S.W.2d 280, 284 (Ky.1929). While addressing the constitutionality of the oil severance tax, the *Cumberland Pipe Line* Court determined:

> [t]he plain mandate of the act of 1918 is that the tax commission shall find the market value at the place of production by taking the actual sales as reported from the pipe line companies, and such other evidence thereof as may be available, and deducting therefrom the carriage charges. The result reached in that way is the market value of the oil at the wells.

*Cumberland Pipe Line Co.*, 15 S.W.2d at 284.

In addition, the Court defined the oil severance tax as one "imposed upon the *occupation* of producing the oil" and is, therefore, "*imposed on the producer alone* and for the *privilege* of engaging in the business of producing crude petroleum from oil wells in this state." *Id.* at 283. (Emphasis Added). Therefore, the dissent's representation of the oil severance

tax as a property tax on oil sold at the well-head directly contradicts the holding in *Cumberland Pipe Line.*

Critically, the dissent omits any mention of *Cumberland Pipe Line* whatsoever. This is surprising considering that we recently embraced that case in *Baker,* to support our unanimous decision that Kentucky has long since applied the "at the well" rule in gas *and* oil cases. *Baker* also pays great homage to the authority advanced by the Sixth Circuit in its well-reasoned *Poplar Creek* decision. Of course, *Poplar Creek* also relied heavily on *Cumberland Pipe Line. See Poplar Creek Development Co.,* 636 F.3d at 244 (citing *Cumberland Pipe Line* for the proposition that "[t]here is seldom, if ever, a market at the place of production."). Therefore, the majority and dissent in the present case— as well as the Sixth Circuit—agree that the "at the well" rule and its accompanying "work-back" method apply to the production of oil as well as gas.

Similarly, the *Burbank* Court was well aware of the "at the well" rule discussed in *Cumberland Pipe Line,* and certainly considered that rule when reaching its determination. *Burbank,* 202 S.W.2d at 422 (citing *Cumberland Pipe Line,* 15 S.W.2d at 282). Yet, the "at the well" rule did not supersede the plain language of the severance tax statute at issue in *Burbank,* nor did it imply terms to the lease where there were none.

It is also necessary to address the dissent's erroneous analogy of taxes and deductable post-production costs. Post-production costs such as gathering, compression, and transportation actually enhance the value of the gas. In contrast, while the sale of gas is contingent upon payment of the severance tax, the tax does *not* enhance the value of the gas. Thus, it would run contrary to the parties' intent—and the purpose of the "at

the well" rule—for the royalty owner to share in an expense that does nothing to improve the quality of the product beyond the well-head. Like administrative and regulatory fees, severance taxes are not a benefit for which the royalty owner bargained. *Cf. Hockett v. Trees Oil Company,* 292 Kan. 213, 251 P.3d 65, 72 (2011) (holding that state conservation fees assessed downstream against first purchasers did not constitute post-production costs that were required to be shared by the royalty owner.).

The authority cited by EQT on this issue is also unpersuasive. For example, the gas division order that supplemented the lease at issue in *Cartwright* contained a provision authorizing the lessee/producer to deduct, "all production and severance taxes required to be paid with respect to the interest of the [lessors]. . . ." *Cartwright,* 182 S.W.3d at 446. Clearly, the lease now in dispute contains no such provision.

Having considered the authority from other states offered in support of EQT's argument, we determine that *Burbank* is controlling and that its logic remains sound. Therefore, we hold that absent a specific lease provision apportioning severance taxes, lessees may not deduct severance taxes or any portion thereof prior to calculating a royalty value. Appalachian is not contractually liable for any portion of the gas severance tax.

### Economic Considerations

Amicus further contends that assessing the entirety of severance tax expenses to producers "would have a devastating effect on many of the small producers who are the backbone of Kentucky's $1.1 billion dollar oil and gas industry." This time-worn tactic has been used by mineral producers for over a century to plague this embattled region of our Commonwealth.

It is a fundamental principle of free markets that regardless of regulatory apportionment a tax will be passed along and, thus, in large measure "paid" by the market participant most willing to endure it. For example, a "sin tax" is an excise tax on vice that is remitted by the retailer/supplier but the majority of which is borne by the end user in the form of increased prices. While the government enjoys a considerable amount of additional revenue, the resulting decrease in the quantity demanded for the product subjected to the increased tax is relatively minimal.

In contrast, it is much more complex to calculate the precise change in natural gas production and consumption relative to a slight increase in producers' severance tax expenses. What is certain, however, is that the severance tax will inevitably be "paid" by the market participant most willing to endure it. That may or may not be the producer.

In any event, whether an increase in producers' tax expenses reduces profits to a sum that drives them out of the market—or actually reduces profits at all—is a determination ultimately decided by the market, not the Court. Any additional economic analysis is not the domain of this Court and should not instruct our decision. Tax policy is a legislative concern. *See Burbank,* 202 S.W.2d at 422 ("A fair division of the tax is a matter for the Legislature[ ]. . . ."). We are charged with interpreting and applying the law. Here, the law is clear. The severance tax was intended to be a levy for the *privilege* of severing or processing the gas. Absent statutory or contractual apportionment, the tax is assessed exclusively to the producer/lessee.

We reach this conclusion having due regard for all those involved in the mining industry, including producers. However, we cannot ignore the rights and interests of landowners engaged in mineral transactions. In that same vein, this Court recently brought common sense and clarity to our mineral trespass law by affording landowners the same recovery as producers. *Harrod Concrete and Stone Company v. B. Todd Crutcher,* 458 S.W.3d 290 (Ky.2015). Thus, if we were to weigh the equities in this case, the well-being of the landowner—historically given secondary consideration—deserves equal consideration to the potential economic losses of natural gas producers.

### Conclusion

For the forgoing reasons, we certify that: 1) royalty owners are not statutorily liable for the severance tax assessed under KRS Chapter 143A; and 2) absent a specific contractual provision apportioning severance taxes, lessees may not deduct severance taxes or any portion thereof prior to calculating a royalty value. Accordingly, Appalachian is not liable for any portion of the natural gas severance tax. The law is hereby certified to the United States Court of Appeals for the Sixth Circuit.

All sitting. Barber, Cunningham, Keller, Noble, and Venters, JJ., concur. Venters, J., concurs with separate opinion in which Noble, J., joins. Abramson, J., dissents by separate opinion in which Minton, C.J., joins.

VENTERS, J., CONCURRING:

I concur with the majority opinion. However, while I find it relevant that KRS Chapter 143A identifies the producer (here, EQT) rather than the royalty owner (Appalachian Land) as the ultimate taxpayer, I further believe that the calculation of the royalty is less a question of legislative intent and statutory construction, and more a question of construing the mineral

lease and carrying out the expectations of the parties in a world where there is no longer a "market price of gas at the well."

In the absence of an actual market price at the well, the industry must resort to the method we described in *Baker v. Magnum Hunter Production, Inc.,* —— S.W.3d —— (Ky.2015), which involves deducting the producer's postextraction costs for processing and transporting the gas from the final market price to arrive at a proxy for the "market price at the well." After reviewing that method, I am convinced that the severance tax is not a true cost of production in the economic sense. Certainly, it is an accounting expense that is paid by the producer; and certainly it reduces, or may even eliminate, the profitability of extracting the gas. But it is not a cost of production; it is not an expense incurred to convert the raw gas into a final product; the tax adds no value to the final product.

The severance tax is simply a tax assessed on the sale of gas *after* the production process has been completed. Therefore, I agree that in calculating the royalty due, the severance tax should not be included as part of the postextraction production costs deducted from the final sales price.

Noble, J., joins.

## ABRAMSON, J., DISSENTING:

I respectfully dissent. Pursuant to Kentucky Rule of Civil Procedure (CR) 76.37(1), the United States Court of Appeals for the Sixth Circuit certified the following question of Kentucky law:

> Does Kentucky's "at the well" rule allow a natural-gas processor to deduct all severance taxes paid at market prior to calculating a contractual royalty payment based on "the market price of gas at the well," or does the resource's at-the-well price include a proportionate share of the severance taxes owed such that a processor may deduct only that portion of the severance taxes attributable to the gathering, compression and treatment of the resource prior to calculating the appropriate royalty payment?

This Court accepted the certified question and, as explained below, I would answer it in accord with the question's second option. Kentucky Revised Statute (KRS) 143A.020 imposes a tax on the "severing and/or processing" of certain natural resources, including natural gas. Although often referred to simply as a "severance tax," the statute plainly taxes both the severance and the processing of natural gas. In my view, where a royalty is based on the market price "at the well," the natural-gas processor may deduct that portion of the tax attributable to those post-production costs which the processor is allowed to deduct from the sale price prior to calculating the royalty, but it may not deduct the portion of the tax attributable to its initial severing or extraction of the gas. That portion of the tax attributable to severance is a production cost for which the natural gas producer is solely liable under the lease.

### *RELEVANT FACTS*

As explained by the Sixth Circuit Court of Appeals, the case before it arose when a Pike County land owner, the Appalachian Land Company, brought suit in the United States District Court for the Eastern District of Kentucky against EQT Production Company, a natural-gas extractor and processor. Appalachian claimed that EQT had underpaid royalties owed to Appalachian in exchange for natural gas EQT had acquired from Appalachian's land. At the center of the dispute is language in a 1944 oil and gas lease executed by the parties' respective predecessors-in-interest (the "Lease").

Appalachian is the successor-in-interest of one Robert Williams, who, in 1944, leased certain oil and gas rights to EQT's predecessor-in-interest, the Kentucky West Virginia Gas Company, Inc. Pursuant to the Lease, the lessee, now EQT, is to pay the landowner-lessor, now Appalachian, a royalty on natural gas extracted from the land "at the rate of one-eighth (1/8) of the market price of gas at the well." The natural gas in this case is not sold in its raw state at the well, but rather "downstream" at an interstate pipeline connection after EQT has processed and transported the gas. To arrive at an "at the well" market price, EQT works back from the price at the point of sale to a well-head price by deducting from the sale price all post-extraction processing costs (also referred to as "post-production costs"); transportation costs; and all severance and processing taxes. It then pays Appalachian one-eighth of the remainder. Appalachian has maintained that in arriving at a "market price" for royalty purposes EQT should not have deducted the postproduction costs or the severance/processing taxes and that the improper deductions resulted in an underpayment of royalties.

With respect to processing costs, Appalachian contended in the district court that costs incurred to render the raw gas marketable in the first instance should not be deductible. Those post-production costs include the costs of gathering gas from individual wells into larger transmission pipelines, of compressing low pressure gas and of treating—removing hydrogen sulfide or other impurities—gas too "sour" to be usable. Appalachian posited that costs incurred to enhance the marketability of already marketable gas should be deductible only if they did in fact contribute to enhanced marketability. Over the last twenty-five years or so (actually longer in Kansas), this so-called "marketable prod-

uct" (or "first marketable product") approach to royalty valuation has been adopted to varying degrees by a handful of states including Colorado, Kansas, Oklahoma, Arkansas, and West Virginia. Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the Product?*, 37 St. Mary's L.J. 1 (2005); Brian S. Wheeler, *Deducting Post–Production Costs When Calculating Royalty: What Does The Lease Provide?*, 8 Appalachian J.L. 1 (2008); Randy Sutton, *Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs*, 99 A.L.R.5th 415 (2002). Under the older approach still subscribed to in a majority of jurisdictions—the "at the well" rule—costs incurred by the lessee to bring the gas to the surface, such as exploration, drilling, and well-maintenance costs, are deemed "production costs" and are not chargeable to the royalty interest, *i.e.,* those costs cannot be deducted from the sale price before calculating the royalty. The royalty *is* subject, however, to "post-production costs," costs incurred after the gas reaches the well-head, whether to improve its quality or to transport it to the point of sale, such costs typically being deducted from the sale price before the royalty is calculated. *Kilmer v. Elexco Land Services, Inc.*, 605 Pa. 413, 990 A.2d 1147 (2010); *Bice v. Petro–Hunt, L.L.C.*, 768 N.W.2d 496, 501 (N.D.2009).

In *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC,* 636 F.3d 235 (6th Cir. 2011), the Sixth Circuit Court of Appeals construed Kentucky law as adhering to the majority "at the well" rule. In light of *Poplar Creek,* the federal district court rejected Appalachian's contention that the price upon which its royalty was calculated should not have been reduced for certain "first marketable product" production costs. Today, in *Baker v. Magnum Hunter Production, Inc.,* —— S.W.3d ——, 2015

WL 4967131 (Ky. August 20, 2015), this Court speaks for the first time to the "first marketable product" rule and confirms that the Sixth Circuit correctly construed Kentucky law in *Poplar Creek* when it concluded that market value at the well requires a "work-back" from the sale price, *i.e.*, post-production costs are to be deduct-ed from the ultimate sale price to arrive at an "at the well" value for royalty purposes. Finding no meaningful distinction between severance/processing taxes and the other post-production costs, the federal district court in this case also rejected Appalachian's contention that the "market price at the well" for royalty purposes should not have been further reduced by severance and processing taxes.

On the severance/processing tax issue, Appalachian moved the district court to alter or amend its judgment and argued that the deduction of severance and processing taxes from the sale price of natural gas prior to calculating the royalty payment in effect imposed a portion of those taxes on the royalty owner contrary to the intent of the Kentucky tax statutes. Denying the motion to alter or amend, the district court acknowledged that "[u]nder the lease, EQT would be prohibited from deducting severance taxes if EQT paid those severance taxes based on the price of the gas 'at the well.'" In the court's view, however, because "the taxes are paid at the market price, which is higher than the at-the-well price ... it is permissible to deduct severance taxes, as well as other postproduction costs, from the market

price in order to 'work back' to calculate the at-the-well price."

Appalachian appealed but eventually conceded that *Poplar Creek,* as the law of the circuit, is determinative of its claim that post-production costs expended to produce a "first marketable product" should not be deducted from the sale price prior to calculating the royalty. Appalachian continues to assert, however, that the royalty payments due to it should have been based upon the market value of the gas before deducting the Kentucky severance and processing taxes.[3] Because *Poplar Creek* did not directly address that question, the United States Court of Appeals for the Sixth Circuit has certified to us the question of law stated above, "regarding the intent and reach of the Kentucky severance-tax statute."

### ANALYSIS

KRS Chapter 143A, entitled "Natural Resources Severance and Processing Taxes" provides for a tax on all natural resources contained in the "soils or waters of this state," with the exception of coal and oil which are taxed under separate statutes. KRS 143A.010(2). In pertinent part, KRS 143A.020 imposes on "all taxpayers severing and/or processing natural resources in this state" a tax that is "in addition to all other taxes imposed by law." Imposed expressly "for the privilege of severing or processing natural resources," the tax is currently levied at "four and one-half percent (4.5%)" of "the gross value of the natural resource [here the natural gas] severed or processed."[4] *Id.* "Severing" means "the physical removal of the

---

3. Appalachian argues in this Court that it is not responsible for any of the severance/processing tax or, alternatively, it is only responsible for its proportionate share of the tax attributable to post-production processing. This alternative position, the second option in the certified question, results in the tax burden mirroring the Lease, with the lessee,

EQT, responsible for all production (severance) costs, including the severance portion of the tax, and the parties sharing (seven-eighths/one-eighth) the post-production costs, including the processing portion of the tax.

4. The statute provides for different tax rates for clay (KRS 143A.037) and limestone used

natural resource from the earth or waters of this state by any means." KRS 143A.010(3). " 'Processing' includes but is not limited to breaking, crushing, cleaning, drying, sizing, or loading or unloading for any purpose." KRS 143A.010(6). For purposes of the severance/processing taxes, the General Assembly has defined "taxpayer," in pertinent part, as

> any individual ... [or] corporation ... engaged in the business of severing and / or processing natural resources in this state for sale or use. In instances where contracts, either oral or written, are entered into whereby persons, organizations or businesses are engaged in the business of severing and /or processing a natural resource but do not obtain title to or do not have an economic interest therein, the party who owns the natural resource or has an economic interest is the taxpayer.

KRS 143A.010(4)(a) "Economic interest" is defined in KRS 143A.010(4)(b) in a manner that, when read with subsection (4)(a), excludes as taxpayers those parties who only receive "an arm's length royalty" on the natural resource:

> For purposes of this chapter, a taxpayer possesses an economic interest in a natural resource where the taxpayer has acquired by investment any interest in a natural resource and secures, by any form of legal relationship, income derived from the severance or processing of the natural resource, to which he must look for a return of his capital. *A party who has no capital investment in the natural resource or who only receives an arm's length royalty shall not be considered as having an economic interest.*

KRS 143A.010(4)(b) (emphasis supplied).

Natural gas is expressly identified as a "natural resource," KRS 143A.010(2), subject to the severance/processing tax in KRS 143A.020. Under a natural gas lease such as the one at issue here, the landowner-lessor does not engage in the business of severing or processing the natural gas but by contract conveys those rights to the lessee. *Cf. Cimmaron Coal Corp. v. Dep't of Revenue,* 681 S.W.2d 435, 437 (Ky.App. 1984) (mineral owner who leases his coal to a severor of coal is not 'engaged in severing' that coal). Thus, in the first full paragraph of the Lease, the Lessor "grants and warrants generally, the title to all the oil and gas in and under" the leased property to the Lessee, now EQT, who is charged with producing and marketing the oil and gas. Applying the statutory language *supra,* EQT is the taxpayer under the first sentence of KRS 143A.010(4)(a) because it is engaged in "severing and/or processing" natural gas "for sale." The second sentence of KRS 143A.010(4)(a) is not applicable here because EQT does "obtain title to" and does have "an economic interest" in the gas under the Lease. Thus, the "economic interest" definition in KRS 143A.010(4)(b), which excludes parties receiving an "arm's length royalty," is not literally applicable to the facts before us, either. In any event, under a lease such as the one at issue here the lessee who severs and processes natural gas for sale is the taxpayer.

Notwithstanding the statutory identification of the taxpayer responsible for payment of the tax to the Commonwealth, the parties to a lease could, of course, agree between themselves to redistribute the severance/processing tax burden by expressly assigning all or a portion of it to the landowner-lessor. They could, for example, expressly agree to share the tax in proportion to their respective interests in

in the manufacture of cement (KRS 143A.036).

the sale proceeds. *See e.g.*, Wheeler, 8 Appalachian J.L. at 3 (Rocky Mountain Mineral Law Foundation lease form providing for a proportionate royalty reduction for "all production, severance and ad valorem taxes"); *Poplar Creek Development*, 636 F.3d 235, 242 n.5 (lease "provid[ed] that the lessee must pay all taxes on gas produced under the lease, except with respect to the one-eighth royalty"); *and cf. Tenneco West, Inc. v. Marathon Oil Co.*, 756 F.2d 769 (9th Cir.1985) (construing lease provision transferring severance and processing taxes to lessee). The Lease in this case makes no express reference to taxes, and since it was executed in 1944, some thirty-six years before the 1980 adoption of the "Natural Resources Severance and Processing Taxes" Chapter, 1980 Ky. Acts 1229 (H.B. 968), the original parties had no reason to anticipate and address a future tax on the severance and processing of the natural gas.

Although the Lease does not address taxes, it clearly provides that royalty payments to the landowner-lessee are to be based on "the market price at the well."[5] As noted above, in the absence of an actual well-side sale or comparable sales at other wells, a standard method (applicable in the majority of states including Kentucky) for determining the "at the well" price is to deduct from the actual sale price those post-production costs incurred downstream from the well. *Baker v. Magnum Hunter*, at ——. Because the severance/processing taxes were calculated "downstream" in this case, the federal district court deemed them in their entirety "downstream" costs excludable from the sale price for royalty calculation purposes. This approach fails to recognize the distinction in severance and processing, a distinction that is underscored throughout KRS Chapter 143A but particularly with reference to KRS 143A.060(2) regarding the collection of the tax. That statute provides:

Notwithstanding any other provisions of this chapter to the contrary:

(2) (a) In the case of natural gas, except for those cases:

1. Where the person severing or severing and processing the natural gas will sell the gas to the ultimate consumer; or

2. Where the department determines that the collection of the taxes due under KRS 143A.020 would be ac-

---

5. As the Pennsylvania Supreme Court has explained, in years past natural gas sales typically occurred at the wellhead, but after deregulation of the industry in the 1980s, such sales generally occur downstream at another location.

> Prior to the late 1980's, the role of the producer was to explore for oil and maintain the wells. When the gas came out of the well, the producer sold it to the pipeline company at the wellhead for a federally regulated price. The pipeline company would then assume all the responsibilities of transforming the raw product (sour gas) into marketable natural gas (sweet gas) and transporting it to the market place, where the gas was sold to local distribution companies. The pipeline company would sell the gas at a higher price, given the value added in the process of transforming and transporting it from sour to sweet gas. The producer, however, was paid a price for the natural product when it sold the gas to the pipeline company at the wellhead, and royalties for the landowner were calculated based on that "at the wellhead" price.

> \* \* \* \* \* \*

> In the 1980's the natural gas industry changed dramatically based on fears that the pipeline companies had monopoly power. The federal government required pipeline companies to unbundle their transportation services from their own natural gas sales efforts and, in effect, provide common-carriage services to others, including gas producers, who wished to transport natural gas. This has been referred to as the deregulation of the industry.

*Kilmer*, 990 A.2d at 1155.

complished in a more efficient and effective manner through the severor, or severor and processor, remitting the taxes, the first person to purchase the natural gas after it has been severed, or in the event that the natural gas has been severed and processed before the first sale, the first person to purchase the natural gas after it has been severed and processed, shall be liable for the collection of the tax imposed under KRS 143A.020. He shall collect the taxes imposed from the person severing, or severing and processing, the natural gas, and he shall remit the taxes to the department. In those cases where the person severing or severing and processing the natural gas sells the gas to the ultimate consumer, the person so severing or severing and processing the natural gas shall be liable for the tax imposed under KRS 143A.020. In those cases where the department determines that the collection of the taxes due under KRS 143A.020 from the severance or severance and processing of natural gas would be accomplished in a more efficient and effective manner through the severor, or severor and processor, remitting the taxes, the department shall set out its determination in writing, stating its reasons for so finding, and so advise the severor or severor and processor at least fifteen (15) days in advance of the first reporting period for which such action would be effective.

Although somewhat awkwardly drafted, KRS 143A.060(2) provides that the "first person to purchase" is liable for the "collection of the tax," except in those instances where the natural gas producer sells directly to the "ultimate consumer," a scenario not applicable here. Thus, the first purchaser must withhold from the producer 4.5% of the gross value of the gas purchased and remit that amount to the Department of Revenue.[6] More importantly, the statute recognizes that that first purchase can be either "after [the natural gas] has been severed," *i.e.*, at the well-head, or, alternatively it can be after the gas "has been severed and processed," *i.e.*, downstream from the well. So KRS 143A.060(2) makes clear that the act of severing alone is a taxable event that can result in the levy of the tax. If a company simply severs the gas and sells it at the well-head to another company that will process and transport the gas, the severance tax would apply to the natural gas in its raw form at the wellhead. As the companion case, *Baker v. Magnum Hunter*, illustrates, the unprocessed natural gas at the well-head is much less valuable than the processed, enhanced product[7] delivered to the point of sale downstream, so the tax collected obviously would be less. Where the same company both severs and processes the gas, however, the tax is not collected until that first sale downstream from the well. Nevertheless, it is evident from the tax collection statute (KRS 143A.060) as well as the consistent reference throughout KRS Chapter 143A to "severing and/or processing" that the tax is divisible in that it covers both the initial act of severance (producing the gas by bringing it to the well-head) and the subse-

6. The Department of Revenue is now known as the Revenue Cabinet but I refer to it as the Department throughout this opinion because that is the language employed in KRS Chapter 143A.

7. The Pennsylvania Supreme Court referred to this final product as "value-added sweet gas," distinguishable from the "raw/sour gas at the wellhead." *Kilmer,* 990 A.2d at 1155.

quent collection and processing of the natural gas as it moves from the well-head to become the final saleable product.

In my view, the Kentucky legislature's consistent use of "severing and/or processing" in Chapter 143A and careful attention to the distinction between "severing" and "processing" in the KRS 143A.010 definitions cannot be overlooked. *Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky.2011) ("In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose ∴."). The legislature's careful delineation of the acts of "severing" and "processing" reflects a deliberate effort to identify precisely what is being taxed. Accordingly I conclude a distinction should be made between the initial severance tax imposed, in effect, upon "production," "the physical removal of the natural [gas] from the earth," and the remaining portion of the tax attributable to the "post-production" processing. The severance tax is simply one of the production costs a lessee assumes for the right to capture the resource, while the remainder of the tax collected when the processed (enhanced, more valuable) product is sold downstream is a post-production cost. This analysis is consistent not only with the carefully chosen language in the statute but also with the realities of natural gas leases in Kentucky.

In *Baker v. Magnum Hunter*, we established that if a natural gas producer, like EQT, is not allowed to deduct post-production costs to arrive at a market price "at the well," (if the first marketable product rule urged by Appalachian in the federal courts were applied), the landowner-lessor would receive a one-eighth royalty on an enhanced product (the processed natural gas which has been transported to market) without bearing any of the costs associated with achieving the enhanced product. Consequently, the landowner-lessor would receive more than one-eighth of the "market value at the well" of the raw natural gas. Allowing the deduction of post-production costs to arrive at the market value at the well (the "work-back" method), results in both parties sharing proportionately the post-production costs necessary to get the enhanced product to market and preserves the parties' contracted-for seven-eighths/one-eighth division of proceeds from a sale of the raw gas "at the well."

Since 1980 the severance/processing tax has been an unavoidable cost of selling natural gas; gas simply cannot be sold without remittance of 4.5% of its gross value [8] to the Commonwealth of Kentucky. Pursuant to KRS 143A.060(2)(a), quoted *supra*, the first purchaser "shall be liable for the collection of the tax," and thus must withhold it from the sum otherwise owed to the gas producer and remit it to the Department of Revenue. To assure taxes are being reported and remitted, KRS 143A.060(2)(b) and (c), respectively, mandate monthly reports to the Department from both the first purchasers and "each person severing, or severing and processing" the natural gas. If lessees that sever and process natural gas are allowed to deduct the tax in its entirety (as EQT now does) before calculating the royalty, they and the landowner-lessors will share the tax in proportion (seven-eighths/one-eighth) on the gross value of the final enhanced product but, in doing so, that portion of the Kentucky tax attributable to the initial severance (the extraction or pro-

---

8. "Gross value" is essentially the amount received or receivable by the taxpayer less the

transportation expense. KRS 143A.010(5).

duction of the raw natural gas) has been shifted onto the landowner-lessor in contravention of the "market price at the well" royalty provision in the lease. By disallowing the deduction of the true "severance" portion of the tax (attributable to severance/production) but allowing deduction of the "processing" portion of the tax (attributable to post-production costs), the parties' contracted-for proportionate shares of "market price at the well" are fully preserved and the Kentucky's legislature's careful parsing of "severing" vis-à-vis "processing" is respected and implemented. In response to the Sixth Circuit's query regarding "the intent and reach" of the statute, I conclude the second option in the certified question embodies the correct treatment of the severance/processing tax.

Although the certified question allows for only two options—full deduction of the severance/processing tax from the sale price or deduction of only that portion of the tax attributable to processing (post-production) costs—the majority opines that neither option is appropriate and that landowner-lessors under natural gas leases like the Lease at issue here have no responsibility for any portion of the KRS Chapter 143A natural resource tax.[9] This, of course, results in the lessee paying 100% of the severing/processing tax levied at the first sale, a sale which must occur before that lessee can realize a profit on its investment or the landowner-lessor can receive a royalty under the lease. The majority relies largely on *Burbank v. Sinclair Prairie Oil Co.*, 304 Ky. 833, 202 S.W.2d

420 (1946), a crude petroleum oil case which merits some discussion.

Sinclair, an oil producer, had the exclusive right "to drill for and produce oil" under a lease with Burbank, a landowner in Henderson County. 202 S.W.2d at 421. Before calculating Burbank's one-eighth royalty on "all oil produced and sold from the lease property," Sinclair deducted from the sale price the oil production tax imposed by KRS Chapter 137. Finding this practice objectionable, Burbank brought a declaratory judgment action. This Court's predecessor recounted the original 1917 statutory language imposing the tax:

> Every person, firm, corporation and association engaged in the business of producing oil in this State, by taking same from the earth, shall, in lieu of all other taxes on the wells producing said oil imposed by law, annually pay a tax for the right or · privilege of engaging in such business.

*Id.* at 422. The very next year the legislature deleted the words "by taking same from the earth" and the final phrase "for the right or privilege of engaging in such business." *Id.* at 424. After reviewing the evolution of the oil production tax statute, the Court concluded that "the Legislature had in mind the person, firm, etc., making it his or its business to drill, bring in the oil and put the product on the market, should bear the tax." *Id.* at 423. With this assessment of legislative intent, the *Burbank* Court held the statute "cannot be construed as placing any part of the tax in question on one who is simply royalty owner."[10] *Id.* at 425.

---

**9.** In disregard of the statute, the majority treats the tax as purely a "severance" tax, ignoring the imposition of the tax on a natural resource that has been both "severed" and "processed" into a more valuable product, saleable at a point removed from the well-head. If the natural resources tax were a pure severance tax, it would be levied solely

on the raw natural gas at the well (and the taxes would not be referred to as "natural resources severance and processing taxes" in KRS Chapter 143A.).

**10.** *Burbank* appears to have been abrogated when at its next session the Kentucky General Assembly amended KRS 137.120 to include

While the majority places great weight on *Burbank*, the case is readily distinguishable from the issue before us. The tax at issue was a "production" tax on "oil" (later referred to as "crude petroleum" and now referred to as "crude petroleum oil"). KRS 137.120. The tax, both then and now, is "imposed and attached when the crude petroleum is first transported from the tanks or other receptacle located at the place of production." KRS 137.120(3). Two things are immediately obvious: the tax is on the crude oil (the natural resource in its raw state) and it is imposed at the production site (the well-head). Simply put, the production tax was and is based on the market value of the crude oil at the well, and just as in the natural gas lease at issue here, landowner-lessors like Burbank, had no responsibility for production costs. Whatever the market value (sale price) at the oil well happened to be, the landowner-lessor was entitled to one-eighth of that amount without regard to the tax. Sales of an enhanced product downstream, following post-production processing and transport, were not at issue in *Burbank* nor are they even contemplated by the current KRS 137.120 "Tax on production of crude petroleum." Oil production is obviously different from natural gas severing and processing. To the extent *Burbank* has any relevance to the natural gas severance/processing tax issue before us, it underscores that where a natural resource is sold in its raw state at the well the landowner-lessor has no responsibility for any tax exacted at that well-side sale, the tax being a true production cost for which the lessee is liable.

Despite the obvious differences in the "crude oil sold and taxed at the well"

scenario in *Burbank* and the downstream sales of processed, enhanced gas at an interstate pipeline connection at issue here, the majority argues that the same result (no tax on the landowner-lessor) obtains. This position, requiring the lessee to absorb all of the severance/processing taxes necessary to the sale, ignores the fact that the "natural resources severance/processing tax" imposed in KRS Chapter 143A is not simply a "production" tax on a raw natural resource (although certainly it is a true production (severance) tax if the natural gas is sold in its raw state at the well-head), but instead a tax for the "privilege of severing and /or processing" the natural gas.

The majority maintains that under the Lease EQT, and EQT alone, has the "privilege" that is taxed and thus should bear the full brunt of the severance/processing tax. This reading ignores the language of KRS Chapter 143A, which in the levying and collection of the tax focuses on both the severance and the processing stages of getting the product to market for that first sale. Where, as here, there is no sale at the well-head, the natural gas moves from the well-head to market, with the lessee and landowner-lessor under a "market value at the well" lease sharing the post-production (processing and transportation) costs necessary to get a saleable product to the marketplace. In sharing those post-production costs proportionately (seven-eighths to the lessee and one-eighth to the landowner-lessor), the parties are sharing the "privilege" of processing the raw natural resource into a saleable, enhanced natural resource that can be sold elsewhere,

---

among "producer[s] of crude petroleum oil" "any person owning an interest in crude petroleum oil produced in this state." 1948 Ky. Acts Chapter 82, Section 1 (H.B. 297). Thus the victory procured by the landowner-lessor,

Burbank, was promptly undone by a statutory revision that imposed the tax on both the oil producer and the landowner who received a royalty.

resulting in a return for both the lessee and landowner-lessor.

Finally, we are required to consider KRS Chapter 143A in its entirety. *Shawnee Telecom*, 354 S.W.3d at 551 (statute is to be "construed as a whole" and legislature is presumed to have intended "for all of its parts to have meaning."). The majority errs in focusing on the identity of the "taxpayer" (the person accountable to the Commonwealth) to the exclusion of the intent of the General Assembly in imposing the tax—an unmistakable intent to tax both the severance and the processing of a natural resource, two separate activities with different financial consequences for parties to a "market price at the well" lease. Moreover, as the district court in this case observed "the issue ... is not whether Kentucky law requires [Appalachian] to pay a portion of the severance tax ... [but] whether the contract between EQT and [Appalachian] allows EQT to deduct a portion of the severance taxes it pays from ultimate sales price in order to calculate the market price at the well." Given the "intent and reach" of the Kentucky tax statute, I conclude a "market price at the well" contract does allow that deduction.

By distinguishing severance from processing, KRS Chapter 143A fully supports treating the severance/processing taxes like other costs associated with the sale of the natural resource. Just as production costs are not deductible prior to calculating market value at the well (and thus the well-head royalty), that portion of the tax attributable to severance is not deductible. On the other hand, taxes attributable to "post-production" processing, like the other post-production costs, are incurred and paid downstream of the hypothetical well-head sale and, as with those post-production costs, are deductible so that the lessee and landowner-lessor ultimately receive the seven-eighths/one-eighth split of the "market price at the well" for which they contracted. Any other allocation of the tax would destroy the agreed-upon division of the proceeds derived from the sale of the natural gas and ignore the legislature's intent.

### CONCLUSION

In my view, absent express lease terms to the contrary, a natural-gas lessee determining a market value "at the well" for royalty calculation purposes may deduct processing taxes attributable to those post-production costs which it is allowed to deduct as outlined in *Poplar Creek* and *Baker v. Magnum Hunter*. However, the natural-gas lessee may not deduct the severance tax attributable to the initial severing or extraction of the gas because that is a true production cost which the lessee assumes in a lease premised on market value "at the well."

I would so certify the law to the United States Court of Appeals for the Sixth Circuit and thus dissent.

Minton, C.J., joins.